**AMERICAN POTASH & CHEMICAL CORPORATION**
**v.**
**The UNITED STATES.**
**No. 176–66.**

United States Court of Claims.
July 17, 1968.

Karl R. Price, Washington, D. C., attorney of record, for plaintiff; Ivins, Phillips & Barker, Washington, D. C., of counsel.

Mason C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

LARAMORE, Judge.

This is a corporate income tax refund case. The Commissioner of Internal Revenue reduced the amount of a depreciation deduction taken by plaintiff, American Potash & Chemical Corporation (hereinafter referred to as Potash) in each of the four fiscal years which followed July 1, 1956. The only issue before the court is the determination of the basis of depreciable assets upon which the deduction is based. Taxpayer argues that a cost basis is appropriate, and defendant contends that a carryover basis is required. Defendant has moved for summary judgment.

The facts are not in dispute. Taxpayer is engaged in the production and sale of industrial and agricultural chemicals. Between September 1954 and November 1955, Potash acquired all of the outstanding stock of Western Electrochemical Company (hereinafter referred to as Wecco) in exchange for 66,662 shares of its voting stock and $466.12 in cash paid for fractional shares.[1]

Between September 28, 1954 and November 3, 1954, Potash acquired 48 percent of the Wecco stock in exchange for 33,367 shares of Potash plus $466.12 in cash. On November 30, 1955 Potash acquired the remaining 52 percent of Wecco stock in exchange for 33,295 shares of Potash.

Potash made two separate offers to purchase all of the Wecco stock. In August, 1954 it offered each Wecco stockholder one share of Potash (selling at approximately $60 per share) for 6.5 shares of Wecco. For shares not evenly divisible by 6.5 it offered $9.23 per Wecco share (on the basis of $60 per Potash share). That offer expired on November 18, 1954, and some 52 percent of Wecco shareholders did not accept it.

In November, 1955 Potash again approached the Wecco shareholders with a new offer of one Potash share (now selling at $90 per share) for seven shares of Wecco. There were no fractional shares involved. The remaining 52 percent shareholders accepted this offer, and Potash acquired complete ownership.

Plaintiff admits that both of these stock acquisitions were to further its ultimate purpose—obtaining the Wecco assets—and that if it could not have obtained the remaining 52 percent ownership it would have sold the 48 percent interest acquired in 1954.

Potash did not acquire either 80 percent of the total combined voting power of all voting stock or 80 percent of the total number of shares of all other classes of stock during any 12-month period between September 1954 and November 1955.

For seven months, from December 1, 1955 to June 30, 1956, Wecco was operated by Potash. During that period taxpayer advanced $646,293 to Wecco for working capital and other miscellaneous current operating needs. On June 30, 1956, Wecco was completely liquidated and all of its assets were distributed to (and its liabilities were assumed by) Potash. The fair market value of the assets distributed to Potash was $10,843,023. The liabilities assumed were $4,934,448 which, together with the $646,293 advanced, totaled $5,580,741 in liabilities.

For 1957, 1958, 1959 and 1960 fiscal tax years Potash computed its depreciation deduction for the depreciable assets received from Wecco on an adjusted basis of $7,085,551. This was its "cost" of the depreciable assets. That "cost" included the value of the 66,662 shares transferred in acquiring Wecco stock, the liabilities assumed on the liquidation and the cash advanced during the seven months that it operated Wecco. Immediately prior to the liquidation Wecco's basis in these assets was $3,788,779.

On audit of Potash's 1956 and 1957 tax returns the Internal Revenue Service determined that the correct basis of these

1. The purchases involved were as follows:

| Date acquired | Shares acquired | Consideration paid | |
| --- | --- | --- | --- |
| | | Potash stock | Cash |
| 9/20/54 | 191,074 | 29,392 | $239.98 |
| 9/28/54 | 450 | 69 | 13.84 |
| 10/28/54 | 24,625 | 3,785 | 207.69 |
| 11/3/54 | 787 | 121 | 4.61 |
| 11/30/55 | 233,064 | 33,295 | ------- |
| Total | 450,000 | 66,662 | 466.12 |

assets was $3,788,779, the basis in the hands of Wecco prior to the liquidation. Taxpayer's adjusted basis was reduced by $3,296,772 and, accordingly, its yearly depreciation deduction was reduced by $100,843 per year. Taxpayer paid the 1957 deficiency on May 19, 1961. It adjusted its 1958, 1959 and 1960 tax returns, and the increased tax was included in the taxes paid for those years.

Claims for refund for 1957 and 1958 were filed on May 17, 1963. The claims for 1959 and 1960 were filed on September 5, 1963 and September 11, 1964, respectively. The 1957, 1958 and 1959 claims were denied on June 10, 1964, and the 1960 claim was denied on May 25, 1965. Suit was timely filed on June 7, 1966.

For the purpose of this motion, both plaintiff and defendant agree that the stock acquisition of Wecco and its liquidation were undertaken for the purpose of obtaining the Wecco assets, i. e., plaintiff purchased the stock to reach the assets.

### I.

The government, in support of its motion for summary judgment, argues that, as a matter of law, a carryover basis is required because either the entire transaction was a reorganization under section 368(a) (1) (C) of the Internal Revenue Code of 1954, 68A Stat. 120,[2] or alternatively, if the stock acquisition can be

2. All section references are to the Internal Revenue Code of 1954, 68A Stat. 3, as amended by the Revenue Act of 1964, 78 Stat. 19, unless otherwise specified.

3. Section 362(b), 68A Stat. 119, provides:
 "(b) Transfers to Corporations.— If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer."

separated from the liquidation, the assets received in the liquidation are subject to a carryover basis under sections 332 and 334 as assets received by a parent (Potash) in the process of liquidating its wholly-owned subsidiary (Wecco). Plaintiff argues that the transaction cannot be termed a reorganization and that the liquidation transaction, separately considered, is excepted from the application of sections 332 and 334 by the doctrine enunciated in Kimbell-Diamond Milling Co. v. Commissioner, 14 T.C. 74 (1950), affirmed per curiam, 187 F.2d 718 (5th Cir. 1951), cert. denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 which remains viable and was not pre-empted by the enactment of section 334(b) (2), the legislative exception to the general rule of section 334(b) (1).

We will consider each of defendant's alternative arguments separately. We find that the facts do not establish that this transaction was a reorganization, and that the Kimbell-Diamond doctrine has not been pre-empted by the enactment of section 334(b) (2).

### II.

Section 1012 provides that the basis of property is its cost except where otherwise provided. Section 362(b)[3] requires a carryover basis for depreciable assets received in "connection with" a transaction which qualifies as a reorganization as defined in section 368(a) (1).[4] Defendant concludes that a C

4. Section 368(a) (1), 68A Stat. 120, 121, as amended by the Revenue Act of 1964, § 218, 78 Stat. 57, provides, in pertinent part:
 "(a) Reorganization.—
 "(1) In general.—For purposes of parts I and II and this part, the term 'reorganization' means—
 (A) a statutory merger or consolidation;
 (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such ac-

reorganization has occurred and, therefore, a carryover basis is required for the assets.

■ A C reorganization, in general, is a transaction whereby one corporation (the acquiring corporation) acquires substantially all of the property of another corporation (the transferor corporation) as part of an exchange in which the acquiring corporation gives solely its voting stock (or the voting stock of its parent) to the transferor corporation in exchange for the transferor corporation's assets. Under certain limited circumstances, money or other property in addition to voting stock may be exchanged.

■ Before a transaction can be classified as a C reorganization three basic factors must be present. These are (a) an acquiring corporation gives *stock* to another corporation, and (b) receives *in exchange* for that stock (c) substantially all of the *properties* of the transferor corporation.

Defendant argues that taxpayer has not *purchased* Wecco's stock for cash and liquidated [5] but has *exchanged* its stock for Wecco stock and then liquidated Wecco pursuant to its plan and intent to obtain Wecco's assets. Plaintiff, defendant continues, has therefore exchanged its stock for Wecco's assets, a transaction which qualifies as a C reorganization. Defendant contrasts a *purchase* of stock followed by a liquidation (in which the stockholders of the acquired company do not have any stock interest in the acquiring company) with an *exchange* of stock for stock followed by a liquidation (in which the stockholders of the acquired company become stockholders of the acquiring company). In the latter situation, defendant argues that there is a continuity of ownership, which, together with the basic intent to obtain assets establishes that the entire transaction was a reorganization.

■ Taxpayer's intent is considered in determining the existence of an overall plan to accomplish a particular result by a series of steps and in determining the existence of a plan to reorganize. The existence of either a plan to reorganize or a plan to accomplish a particular end result, however, does not necessarily mean that the particular route chosen to accomplish the desired result qualifies as a reorganization, as that term is defined in the statute.

■■ A continuity of ownership and of interest are elements of a reorganization which must be present in addition to the specific exchange provided for by

quiring corporation had control immediately before the acquisition);

(C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded;

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (*including persons who were shareholders immediately before the transfer*), or any combination thereof, is in control of the corporation to which the assets are transferred; but

only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

(E) a recapitalization; or

(F) a mere change in identity, form, or place of organization, however effected."

5. Plaintiff relies on a group of cases wherein assets were "purchased" when a corporation obtained stock for cash and then liquidated. No reorganization issue was presented. See: Prairie Oil & Gas Co. v. Motter, 66 F.2d 309 (10th Cir. 1933); Commissioner v. Ashland Oil & Refining Co., 99 F.2d 588 (6th Cir. 1938), cert. denied, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); Kanawha Gas & Utilities Co. v. Commissioner, 214 F.2d 685 (5th Cir. 1954); United States v. Mattison, 273 F.2d 13 (9th Cir. 1959); Pressed Steel Car Co., 20 T.C. 198 (1953); Orr Mills, 30 T.C. 150 (1958).

the statute.[6] See: Reg.Sec. 1.368–1(b). The existence of either one or both elements does not establish that the particular process through which continuity was achieved is a reorganization. Nor does the end result of· a transaction establish the presence of a reorganization. The existence of a continuity of ownership indicates only that one element of a reorganization is present. The particular transaction must meet all of the specific requirements of the statute before we can conclude that a reorganization occurred.

A regulation under section 368 (Reg. § 1.368–1(b)) explains the purpose of the specific requirements of the reorganization provisions. It states:

> * * * *In order to exclude transactions not intended to be included, the specifications of the reorganization provisions of the law are precise. Both* the *terms* of the specifications *and the underlying assumptions and purposes* must be satisfied in order to entitle the taxpayer to the benefit of the exception from the general rule [gain or loss must be recognized on the exchange of property]. [Emphasis supplied.]

We note that defendant admits, and we agree, that the form of this transaction—a transfer of Potash stock to the shareholders of Wecco in return for the stock of Wecco—resembles, and would seem to invoke the provisions of, section 368(a) (1) (B), if any reorganization provision were applicable. Without question, the basic transaction was a stock for stock exchange (B reorganization) rather than a stock for asset exchange (C reorganization). Potash transferred stock to, and received stock from, the Wecco shareholders. It did not transfer stock to the Wecco corporation in return for a transfer by the corporation of its assets.

 In our view the transaction does not meet the requirements of a B reorganization but only because control of Wecco was not obtained by a series of stock for stock exchanges within a 12-month period (as is required by the applicable regulations, infra). This is an aspect of the attainment of stock control by "creeping acquisitions" rather than a single stock for stock exchange.

The creeping acquisition of control problem arose under the 1939 Code in a B reorganization when an acquiring corporation owned some stock of the corporation to be acquired but less than control. To resolve any lingering doubts about the validity of classifying successive stock for voting stock exchanges as a ·B reorganization, the 1954 Code specifically approved its use in the context of a B reorganization. See: S.Rep. No. 1622, 83d Cong., 2d Sess. 273 (1954), U.S.Code Cong. & Admin.News 1954, p. 4629.

By its regulation (Reg. § 1.368–2(c)), which echoes S.Rep. No. 1622, supra, the government provided:

> Such an acquisition [B reorganization] is permitted tax-free in a single transaction or in a series of transactions taking place *over a relatively short period of time such as 12 months.* [Emphasis supplied.]

The infirmity, in this case, is that the entire transaction took place over a period of 14 months, and plaintiff never obtained control within any 12-month period. Defendant has not urged that this was a B reorganization. Were this a B reorganization which was complete when the stock for stock exchange resulted in control, we would be faced with a problem which has faced many other courts, i. e., whether the post-reorganization liquidation was an integral step of the overall plan to obtain the assets and, therefore, a carryover basis is appropriate for the assets received in the process of liquidation. The liquidation is denied independent tax significance, and a carryover

---

6. Southwest Natural Gas Co. v. Commissioner of Internal Revenue, 189 F.2d 332 (5th Cir. 1951), cert. denied, 342 U.S. 860, 72 S.Ct. 88, 96 L.Ed. 647; Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428 (1933) ; LeTulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 1035 (1940) ; United States v. Hendler, 303 U.S. 564, 58 S. Ct. 655, 82 L.Ed. 1018 (1938).

basis is imposed. We will discuss the post-reorganization liquidation problem in more detail at a later point. Insofar as the facts of this case are concerned, Potash did not obtain control within a 12-month period, and we find that a B reorganization did not occur.

Defendant argues that despite its form (stock for stock) the entire transaction should be tested as a C reorganization because plaintiff has stated that it intended to obtain Wecco's assets. This position is premised on our integrating and collapsing the several transactions which began with the first acquisition in 1954 and ended with the assets received in the June 1956 liquidation into a "single transaction". That "single transaction," defendant argues, is a reorganization when measured against the provisions of section 368(a) (1) (C). Plaintiff's intent, as mentioned above, is relevant to the existence of a plan to obtain the assets and is an important factor when we are faced with denying independent tax significance to a liquidation which follows a reorganization. It does not establish that a reorganization occurred, or that *stock* was, in fact, *exchanged for assets* as is required in a C reorganization.

The issue before the court is whether we can transform a stock for stock exchange which does not itself qualify as a B reorganization, into a C-type stock for asset exchange by finding that the subsequent liquidation and distribution of the assets of the acquired corporation had no tax significance and that Potash, therefore, exchanged its stock with the Wecco corporation for the Wecco assets. The issue before us is not whether a liquidation which follows a valid B reorganization is to be given independent tax significance. In this case we are faced with the more basic problem; i. e., finding if a reorganization occurred. We cannot find any decision which has transformed a non-qualifying B-type exchange into a

valid C reorganization by concluding that a subsequent liquidation of the acquired corporation was without significance. Defendant has not urged that this transaction was anything other than a C reorganization. Courts have concluded, under comparable circumstances, that the property received in the post-reorganization (qualifying) liquidation was property received in connection with a transaction which separately qualified as a B reorganization.[7] Other courts have concluded that an assets transfer was a mere change in the identity or form of the corporation and, therefore, a reorganization occurred.[8] (Both of these possibilities will be explored at a later point.)

█ Defendant would have us create a C reorganization out of the substructure of an unqualified B-type exchange and a subsequent liquidation. We find that there was no reorganization to which we might attach the liquidation and that the liquidation itself does not transform the non-qualifying B-type exchange into a valid C reorganization.

█ The C reorganization subsection evolved as a "practical merger" alternative and was designed to permit corporate combinations which did not meet the applicable state requirements for a merger or consolidation. The Revenue Act of 1921, 42 Stats. 227, 230, provided, in section 202(c) (2), that:

> The word "reorganization" * * * includes a merger or consolidation (including the acquisition by one corporation * * * of substantially all the properties of another corporation) * * *

The parenthetical exception was construed as permitting combinations which were "effective mergers." See: Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428 (1933); and Cortland Specialty Co. v. Commissioner, 60 F.2d 937 (1932), cert.

---

7. E.g., *Piedmont Financial Co.*, 26 B.T.A. 1221 (1932).

8. E.g., *Ahles Realty Corp. v. Commissioner*, 71 F.2d 150 (2d Cir. 1934), cert. denied, 293 U.S. 611, 55 S.Ct. 141, 79 L.Ed. 761.

denied, 288 U.S. 599, 53 S.Ct. 316, 77 L. Ed. 975 (1933).

The legislative history surrounding the Revenue Act of 1934, 48 Stat. 680, 705, enactment of section 112(g) (1), reaffirmed the interpretation given the earlier statutes and concluded that the "practical merger" provision was designed to permit transactions which are "equivalent to a merger." See: S.Rep. No. 558, 73d Cong., 2d Sess. 17 (1934). This provision, basically, is the present section 368(a) (1) (C).

Corporations may choose between a stock for stock exchange or a stock for asset exchange to effect a combination. Typically, in a C reorganization the transferor corporation is divested of its assets (and usually is liquidated). A B reorganization results in the acquisition of a subsidiary.

One important reason for choosing a B rather than a C exchange is that gradual exchanges of stock may be accomplished in a B "creeping" reorganization. The acquisition of assets in a C reorganization should be accomplished in a single exchange transaction. In addition, the transferor corporation in a C reorganization must obtain stockholder approval before transferring its assets. In a B reorganization, however, each stockholder can, independently, exchange his stock for the stock offered by the acquiring corporation.

There is no evidence that Potash or Wecco could have obtained the approval of Wecco shareholders, and the presence of a dissenting majority during the first series of acquisitions would seem to imply that Potash could not have chosen a C reorganization. Potash states that it was *forced* to seek the Wecco assets by an acquisition of stock because it could not otherwise obtain the assets.

The practical merger aspect of a C reorganization precludes multiple stock for asset exchanges. A creeping asset acquisition is not permissible in a C reorganization as it would be impermissible in a statutory merger.[9]

The stock for stock exchange series in this case would have qualified as a B reorganization (a "creeping acquisition") if control had been obtained within 12 months. Were we to conclude that a C reorganization had occurred because the B reorganization was followed by a liquidation, we would approve a *seriatim* creeping acquisition of stock control which, by virtue of a subsequent liquidation, becomes a *seriatim* acquisition of assets. The latter is not permissible under the statute, and in addition it contradicts the basic "merger equivalence" of a C reorganization.

■ Defendant relies on the step-transaction doctrine to achieve a C reorganization. The application of the step-transaction analysis is an attempt to look through the form of a transaction which was designed to accomplish a particular tax consequence to the reality of the transaction. Commissioner v. Ashland Oil & Refining Corp., 99 F.2d 588 (6th Cir. 1938), cert. denied, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); Ahles Realty Corp. v. Commissioner, 71 F.2d 150 (2d Cir. 1934), cert. denied, 293 U.S. 611, 55 S.Ct. 141, 79 L.Ed. 761.

■ The basic rationale of this rule was first stated in Ashland Oil & Refining Corp. v. Commissioner, supra. Under this concept, as followed and extended by *Kimbell-Diamond Milling Co.,* supra, if a taxpayer who is interested primarily in acquiring a corporation's assets first purchases stock and then liquidates the acquired corporation to reach its assets, the interim, purportedly separate steps taken to accomplish the primary objective will be disregarded and the steps considered a single transaction. Objectively, in form a purchase of stock

---

9. This is in distinction to the "creeping C" reorganization which may occur if the acquiring corporation to be acquired, prior to the stock for asset exchange. See Bausch & Lomb Optical Company, 30 T.C. 602 (1958), aff'd, 267 F.2d 75 (2d Cir. 1959), cert. denied, 361 U.S. 835, 80 S.Ct. 88, 4 L.Ed.2d 76 and Goldman, The C Reorganization, 19 Tax L.Rev. 31, 69–71 (1963).

has been accomplished; in substance the transaction is considered a purchase of property. The transaction, however, is not a reorganization.

 In this case we are not faced with the question of whether each of several steps in a multiple step transaction had a separate business purpose and completeness (and therefore each is to be accorded independent tax significance). The step-transaction doctrine, when applied to a purchase of stock followed by a liquidation, is a determination that some of the several steps are part of a single overall integrated transaction, and the interim transactions are denied tax significance. Admittedly the liquidation of Wecco was pursuant to the basic plan to obtain its assets. Defendant has not argued merely that the liquidation is without tax significance, but that the several steps should be amalgamated into one transaction—a stock for asset exchange. This "collapse" would have us alter the facts of the transaction and does not merely "ignore" certain aspects of the transaction for tax purposes. The explicit statutory reorganization definition—a stock for asset exchange—must, as a matter of fact, occur. The section is detailed and specific. It fixes the tax consequences of corporate combinations and should be applied with some precision. See: Commissioner v. Gordon, United States Supreme Court, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (decided May 20, 1968). There is no doubt that the liquidation of Wecco was part of the single scheme to obtain assets. The existence of this plan to obtain assets, however, does not establish that the specific exchanges involved are within section 368(a) (1) (C).

 Two exchanges occurred in this case—an exchange of Potash stock for Wecco stock and a later liquidation in which Wecco was dissolved and the assets were distributed to Potash. Defendant's analysis is that this was one integrated transaction and, therefore, it became an exchange of stock for assets. If this is an integrated transaction *and the stock for stock exchange were a qualifying re-*

*organization,* at most we could conclude that the liquidation lacked separate tax significance and that the assets were received pursuant to the reorganization. This is the tax treatment of a liquidation which is an integral part of an overall transaction, some other part of which qualifies as a reorganization. Assets which are received in a liquidation that occurs subsequent and pursuant to a valid reorganization are considered assets received in connection with a reorganization, and the basis of these assets in the hands of the transferor corporation is carried over. The reorganization to which the liquidation distribution is connected, generally, is either a B reorganization—stock for stock exchange, or a D reorganization (F under the 1954 Code)—*a mere change in form or identity* of the corporation with a continuation of the same stockholders in the new corporation which owns the assets of the old company. At issue, in these situations, is whether the liquidation was an *independent* transaction. The actual facts of the transaction are not remolded or restructured. The tax consequences of an interim transitory step are ignored, but the facts of each step are neither disturbed nor re-cast. See: Ahles Realty Corp. v. Commissioner, supra; George Whittell & Co., 34 B.T.A. 1070 (1936); Warner Co., 26 B.T.A. 1225 (1932); Piedmont Financial Co., 26 B.T.A. 1221 (1932); Michigan Limestone and Chemical Co., 26 B.T.A. 928 (1932); Mente & Co., 24 B.T.A. 401 (1931); San Joaquin Fruit & Invest. Co. v. Commissioner, 77 F.2d 723 (9th Cir. 1935), reversed on other grounds, 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824 (1936).

In Ahles Realty Corp. v. Commissioner, supra, a new corporation was created. All of the stock of the old corporation was exchanged for the stock of the new corporation, and the new company held the old company as a subsidiary. The old company was thereafter liquidated and the assets transferred to the new company. At the completion of both transactions the sole shareholder of the old company was the sole shareholder of

the new corporation and all of the old company's assets were held by the new company.

The court found that there had been a reorganization, a *D* reorganization. A "mere change in * * * form" had been accomplished. The assets received by liquidation were received "in connection with the reorganization" and, therefore, a carryover basis was required.

The court followed what has become a pattern in these cases. A court finds that a reorganization occurred, that under the step-transaction doctrine the subsequent liquidation was a part of the overall scheme in which the reorganization was an earlier step and, therefore, the assets received upon liquidation were, for tax purposes, received "in connection with a reorganization". We are unable to follow the pattern in this case because there is no valid earlier reorganization to which we can graft the liquidation.

Several other decisions have followed the same basic pattern. In *George Whittell & Co.*, supra, the court found that "a mere change in form had occurred," and it emphasized "the unity of the whole transaction". (34 B.T.A. at 1074–1075). The liquidation was not accorded independent tax significance, and a carryover basis was held appropriate.

In *Piedmont Financial Co.*, supra, the parties stipulated that a reorganization occurred, and the court concluded that the property received in a subsequent liquidation was property acquired "in connection with a reorganization," but it was not property acquired in the course of the tax-free reorganization itself. For defendant to prevail we must conclude that the assets of Wecco were received in the reorganization itself. Assets are received *in* a reorganization where assets are exchanged for stock (C or D reorganization) or by statutory merger (A reorganization). Assets may be received *in connection with any* reorganization defined in section 368(a) (1).

In *Mente & Co.*, supra, stock of a corporation was exchanged for stock and bonds of the new corporation. The same shareholders that had owned the old corporation, owned the new corporation. The old corporation was dissolved. The court did not specify which of several possible reorganization sections was applicable, but it concluded that the assets tranferred by liquidation were received in connection with a reorganization.

These decisions are indicative of the usual step-transaction analysis applied when assets are received pursuant to a liquidation which occurs as part of an overall scheme to obtain assets through a reorganization other than a direct stock for assets exchange. The liquidation of Wecco was part of an overall plan to obtain its assets. The assets, however, were not obtained in connection with a reorganization because the only possible reorganization was the exchange of Potash stock for Wecco stock, and that, by defendant's own admission, was not a qualifying B reorganization.

Defendant contends that the liquidation should be denied any significance because it was an interim transitory step in the overall scheme. Its argument is that the liquidation and the stock for stock exchange should be combined, and that the only transaction which should be given tax significance is the one which did not in fact occur, a transfer of stock for assets. This is a misuse of the step-transaction doctrine which was promulgated to deny the independent tax validity of an interim step in a transaction which is not otherwise disturbed.

In South Bay Corporation v. Commissioner, 345 F.2d 698 (2d Cir. 1965), the court considered an argument comparable to that which defendant has structured in this case. In deciding the applicability of the step-transaction doctrine the court looked to the essential transactional purpose of the scheme and telescoped several steps thereby depriving the intermediate steps of tax significance. The court found that the overall purpose was to acquire assets and, therefore, the intermediate stock acquisition was not given finality. That, however, did not establish that a reorganization occurred. The court found that the taxpayer had pur-

chased assets and that a reorganization had not occurred. The "reorganization" involved was a stock for stock exchange, and in defendant's view the assets were received in connection with that reorganization by a subsequent merger. The court said:

> * * * [T]he Kimbell-Diamond line of cases may be apt guides in determining whether the specific purpose of the whole transaction is, precisely, to acquire assets, as such, and not stock, but it cannot help to resolve the question whether a set of steps resulting in a property acquisition took place by purchase or "in connection with a reorganization." [345 F.2d at 704].

The step-transaction approach does not resolve the question whether a reorganization occurred. It would be available to deny tax consequence to the liquidation as an interim step of a scheme to obtain assets, if the stock for stock exchange had been a qualifying reorganization.

For all of the above reasons, we conclude that the nonqualifying B type exchange cannot be deemed a valid C reorganization by virtue of a subsequent liquidation. A C reorganization requires an exchange of stock for assets which we find did not, in fact, occur. Nor is there a qualifying reorganization pursuant to which we could find that the liquidation was undertaken.

Defendant argues that, in any event, Revenue Ruling 67–274, 1967–35 C.B. 10, is applicable and controlling. The Ruling explains the tax consequences of a transaction wherein X corporation acquires all of the outstanding stock of Y corporation in exchange solely for its voting stock, and thereafter, as part of the same plan, Y is completely liquidated and its assets are distributed to X. The Ruling states that this transaction will be considered a C reorganization rather than a B reorganization.

As explained above, where subsequent to a valid B reorganization the acquired company is liquidated, the assets received in that liquidation (if it is a part of the same scheme), are considered assets received in connection with a reorganization. The Ruling apparently would prefer to consider this a C reorganization rather than a B reorganization to which the liquidation is linked. It is applicable to situations where the stock for stock exchange would qualify as a reorganization and, therefore, it is not applicable to this case. Moreover, if the Ruling is intended to be applicable to stock for stock exchanges which occur during a 12-month period (a creeping acquisition) we would conclude that this approach denies the basic purpose of a C reorganization (to permit combinations which are "practical mergers"). In addition, it would permit taxpayers to circumvent the absence of any provision for a series of *stock for assets exchanges,* by simply liquidating the corporation acquired by a stock for stock exchange, and, by virtue of the Ruling, characterize the transaction as a C reorganization. We find that the Ruling is inapplicable to a stock for stock exchange which is not a qualifying B reorganization.

In any event, the Revenue Ruling was issued on August 26, 1967, some 14 months after suit had been filed on June 7, 1966 and less than one month before the government filed its motion for summary judgment. The Ruling does not state that it is retroactive and, therefore, we conclude that it should be given only prospective effect, if any. See: Crespo v. United States, Ct.Cl., 399 F.2d 191 (decided July 17, 1968).

We do not reach the question posed by both parties, whether the rule enunciated in Mills v. Commissioner of Internal Revenue, 331 F.2d 321 (5th Cir. 1964), for application to B reorganizations, is equally applicable to a C reorganization. That rule, basically, is that cash which is paid in lieu of fractional shares does not violate the requirement that the acquiring corporation transfer *solely* its voting stock.

We turn, therefore, to consider defendant's alternative argument.

## III.

Defendant argues, alternatively, that plaintiff cannot employ a section 1012 cost basis for the depreciable assets even if the transaction is not a reorganization because Potash, on June 30, 1956, adopted a plan of complete liquidation for its subsidiary Wecco. Under these circumstances the assets of Wecco were received by Potash as a distribution in complete liquidation of its wholly-owned subsidiary and, therefore, under sections 332(a) [10] and 334 [11] a carryover basis is required.

The basis of assets received in a complete liquidation is determined by section 334(b) (1).[12] The general rule provides that when a parent corporation liquidates its subsidiary in the process of a non-taxable liquidation, the basis of the property acquired by the parent is the same as the basis in the hands of the subsidiary. This is the carryover basis that defendant argues is applicable.

The exception to this general rule is section 334(b) (2),[13] enacted in 1954, which provides that the basis for the assets received in liquidation shall be the same as the basis of the stock of the subsidiary which is held by the parent. The parent corporation's basis for the subsidiary's stock is generally its cost of the stock, and that amount becomes the basis of the assets. The basis of the assets in the hands of the subsidiary is not carried over to the parent.

On its face it would seem that section 334(b) (1) is applicable and that the transaction does not meet the specific requirements of section 334(b) (2) because Potash did not acquire the requisite amount of stock within a 12-month period. Taxpayer argues, however, that a parent-subsidiary relationship was never created, and that section 334 is inapplicable because throughout the entire 14-month period of acquisition its only purpose and intent was to acquire the assets of Wecco. It argues that the basic doctrine of *Kimbell-Diamond Milling Co.*, supra, is applicable, and that it has not been pre-empted by the enactment of section 334(b) (2).

We will decide only the question whether the *Kimbell-Diamond* doctrine has been pre-empted by section 334(b)

10. "SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

"(a) General Rule.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation."

11. "SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

"(a) General Rule.—If property is received in a distribution in * * * complete liquidation * * *, and if gain or loss is recognized on receipt of such property, then the basis of the property in the hands of the distributee shall be the fair market value of such property at the time of the distribution."

12. "SEC. 334. (b) Liquidation of Subsidiary—

"(1) In general.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)) then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor. * * *."

13. SEC. 334(b) (2) reads: "Exception.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

"(A) the distribution is pursuant to a plan of liquidation adopted—

"(i) on or after June 22, 1954, and

"(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

"(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock * * * was acquired by the distributee by purchase (as defined in paragraph (3)) during a period of not more than 12 months, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. * * *."

(2). We find that it has not and, therefore, return this case to a trial commissioner for further proceedings to determine if it is applicable to the particular facts of this case.

In pre-1954 Code years the statute required a carryover basis for assets received in complete liquidation of a company. This created a difference between the basis for assets which were purchased directly (where a cost basis would be applicable) and assets received in liquidation of a company whose stock was acquired only for the purpose of permitting the acquiring company to liquidate and reach assets which were otherwise unobtainable (a carryover basis was required).

To equate the direct purchase of assets with the indirect acquisition of assets by a purchase of stock, the *Kimbell-Diamond* doctrine was promulgated as an exception to the general rule that a carryover basis is required when a corporation is completely liquidated.

In the *Kimbell-Diamond* case, the government argued that if stock is purchased and the subsidiary thereby acquired is liquidated as part of one unified plan to obtain assets, a purchase of assets (and not stock) has "in reality" taken place and the interim step—liquidation—will not be given tax significance. The taxpayer had purchased stock of another company for cash. Several days later the acquired subsidiary was liquidated and its assets distributed to the parent. The court found that the transaction was *not a reorganization* and concluded that:

> * * * [T]he purchase of * * * [the acquired company's] stock and its subsequent liquidation must be considered as one transaction, namely, the purchase of * * * assets which was petitioner's sole intention. [14 T.C. at 80.]

The step-transaction doctrine developed as part of the broader tax concept that substance should prevail over form. Its application, originally, was as a judicial exception to a statutory general rule

that a carryover basis was required for assets received in liquidation. As defendant would have us apply it in the context of its alternative C reorganization argument, it would create an artificial transaction for qualification under the reorganization provisions which are very specific and exclude all transactions that do not meet their enumerated requirements. The reorganization provisions are designed to include only those transactions which fall within their terms. The step-transaction doctrine, in our view, is not applicable to the extent that defendant employs it to argue that a reorganization occurred.

Neither party disputes the inapplicability of section 334(b) (2). Defendant argues that it is reasonable to conclude that Congress enacted the precise requirements of section 334(b) (2) in an attempt to eliminate further resort to the judicial doctrine of *Kimbell-Diamond* with its attendant problems of determining a taxpayer's subjective intent when it acquired the stock of the corporation which it later liquidated. Defendant argues that the exclusive mechanism for obtaining an exception from the carryover rules of section 334(b) (1) is qualification under section 334(b) (2). Plaintiff argues that the basic doctrine of *Kimbell-Diamond* remains viable and is applicable. The question before us is whether Congress intended to pre-empt the subsequent use of the step-transaction doctrine by enacting section 334(b) (2). We find that it did not intend to eliminate the *Kimbell-Diamond* doctrine.

There is no instance in the legislative history where Congress states either that section 334(b) (2) is the exclusive exception to the carryover rule, or that the *Kimbell-Diamond* rule is superseded or, on the other hand, that it is viable.

Obviously Congress intended to inject some degree of certainty into an area of the tax law previously occupied by problems of proving that a taxpayer had the requisite intent. It is not a necessary conclusion therefrom that Congress intended, by establishing an objective route for obtaining a cost basis without the

need for proving an intent to acquire assets, to prohibit both the government and taxpayers from further resort to proof of a subjective intent to obtain the assets (without complying with the precise objective tests of section 334(b) (2)).

This issue has never before been litigated, and the tax commentary authorities are divided over it.[14] Our examination of the relevant (albeit limited) legislative history reinforces our conclusion that *Kimbell-Diamond* is not "dead". The House Report on the 1954 Code, H.Rep. No. 1337, 83d Cong., 2d Sess. 38 (1954), U.S.Code Cong. & Admin.News 1954, p. 4063, reads:

> * * * under the bill a shareholder will in general be permitted to receive the purchase price for his stock as his basis for the assets distributed to him in liquidation irrespective of the assets' cost to the corporation. In this respect *the principle of Kimbell-Diamond Milling Co.* (5 Cir., 187 F.2d 718) is effectuated. [Emphasis supplied.]

The Senate Report, however, modified the original House proposal and limited the scope of the section to corporate situations where a corporation purchases the stock of another corporation and within two years after the purchase adopts a plan of liquidation. The House proposal would have made the cost-of-stock basis rule applicable to all taxpayers, both individuals and corporations.

The Senate concluded that its substitute provision "effectuates principles *derived* from *Kimbell-Diamond Milling Co., supra*." S.Rep., supra, pp. 38, A109. The principle of section 334(b) (2) is *derived* from the broader, more general rule of *Kimbell-Diamond*. It is a precise, narrow

and objective application of the broader doctrine.

There is no indication that a taxpayer is, by virtue of the precise rule of section 334(b) (2) to be afforded an opportunity to choose between a carryover and a cost basis. The House Report would seem to indicate that a cost basis should be applicable in all situations where a stock purchase is followed by a liquidation, and both are part of one plan. If the statute is the only route for avoiding a carryover basis, a taxpayer can, with relative ease, choose either to comply with the statute or not to comply. There is no indication that the basis of assets acquired in these transactions is an elective matter. Compliance with the statute would result in a cost basis; non-compliance would yield a carryover basis. It would seem preferable, from the government's point of view, to retain the basic step-transaction approach to achieve substance over form in a situation where a taxpayer, possessed of the requisite subjective intent, deliberately avoids the statute.

The *Kimbell-Diamond* doctrine, without question, remains viable for *individual* taxpayers because section 334(b) (2) is applicable only to corporate taxpayers. We cannot conclude that Congress intended to differentiate between corporate and individual taxpayers and permit the use of the judicial *Kimbell-Diamond* doctrine by an individual who has acquired stock during a period in excess of 12 months, and to deny its application to a corporate taxpayer under the same circumstances. There is nothing in the legislative history to indicate that this anomaly was intended. In the absence of some specific direction that *Kimbell-Diamond* is no longer

14. See: Cohen, Gelberg, Surrey Tarleau & Warren, Corporate Liquidations Under the Internal Revenue Code of 1954, 55 Colum.L.Rev. 37 (1955); Goldman, The C Reorganization, 19 Tax L.Rev. 31 (1963); Freling, What is New in Subchapter C: The Service's Current Ruling Policy, 23 N.Y.U. Institute on Federal Taxation 421 (1965); Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders (2d Ed.) 524; Mansfield, The Kimbell-Diamond Situation: Basis to the Purchaser in Connection with Liquidation, 13 N.Y.U. Institute on Federal Taxation 623 (1955); Rabkin and Johnson, Federal Income, Gift and Estate Taxation, (1966) § 23.11(4); 3 Mertens Law of Federal Income Taxation (Rev.) § 20.161; Schwartz, Acquisition of Stock of Another Corporation In Order to Acquire Assets, 1957 So.Cal.Tax Institute 45, 65–66; Brookes, Corporate Liquidations, 1960 So.Cal.Tax Institute 233.

viable, we find that it has not been pre-empted by section 334(b) (2).

Moreover, where Congress intends to modify or to change an existing judicial rule, it generally makes some statement of its purpose for enacting a particular statute. The Senate Report, discussing the modification of section 368(a) (1) (C) to permit the use of the voting stock of a parent corporation, said, at p. 273:

This paragraph is intended to modify the rule of Groman v. Commissioner (302 U.S. 82, 58 S.Ct. 103, 82 L.Ed. 63) and Helvering v. Bashford (302 U.S. 454, 58 S.Ct. 307, 82 L.Ed. 367).

In discussing section 337, the Senate Report noted, at p. 258:

\* \* \* the problems raised by the decision in Commissioner v. Court Holding Company, 324 U.S. 331, 65 S. Ct. 707, 89 L.Ed. 931 and United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251. \* \* \* Your committee intends in section 337 to provide a definitive rule which will eliminate present uncertainties.

In enacting section 1223, the Senate Report, at page 432, states:

This will change prospectively the rule laid down in Commissioner of Internal Revenue v. Gracey (159 F.2d 324) \* \* \*.

Numerous similar examples are present throughout the Code. (See: section 1232 where the decision in Lurie v. Commissioner of Internal Revenue, 156 F.2d 436 (9th Cir. 1946) was specifically over-ruled (S.Rep., supra, at 433); section 1304, where the decision in Hofferbert v. Marshall, 200 F.2d 648 (4th Cir. 1952) was overruled (S.Rep., supra, at 447)). A comparable statement in the legislative history of section 334(b) (2) is conspicuously absent.

We cannot infer that Congress had any intent other than to establish a precise rule under which a taxpayer could proceed, assured that the cost basis of its stock acquired to obtain the assets would become the basis of the assets when they were received in the subsequent liquidation. We conclude that the *Kimbell-Diamond* doctrine has not been pre-empted.

There remain at issue, therefore, questions, involving the presence, or absence, of the factual circumstances wherein the *Kimbell-Diamond* doctrine has been, or should be, applied. In general, it has been deemed applicable when an acquiring corporation planned from beginning to end (and had a subjective intent) to acquire assets of another corporation and, to obtain the assets, it either chose, or was required, to purchase the stock of that other corporation and liquidate. The stock purchase is an interim, transitory step in what is deemed a single unified purchase of assets. We note, but do not now decide, the possible effect of Potash operating Wecco as a subsidiary for seven months and the tax consequences, if any, of a liquidation which is preceded by an exchange of stock or stock rather than a purchase of stock. Defendant's motion for summary judgment is denied. The case is returned to the trial commissioner for further proceedings in accordance with this opinion, to make findings of fact and a recommended conclusion of law on whether the *Kimbell-Diamond* doctrine applies to the facts of this case, and.if not, if it should be extended to include this transaction, and to decide the case accordingly.