WILLIAM I. KOCH *vs.* COMMISSIONER OF REVENUE.

No. 90-P-1147.

Suffolk. January 22, 1992. - December 18, 1992.

Present: PERRETTA, KASS, & IRELAND, JJ.

Further appellate review granted, 414 Mass. 1103 (1993).

*Taxation*, Appellate Tax Board: findings; Income tax; Gross income.

Statement of the so-called step transaction doctrine as a rule of substance over form in analyzing a transaction in a taxation case. [712-716]

On appeal by the Commissioner of Revenue from a decision of the Appellate Tax Board concluding that a taxpayer had effectively transferred his shares in a closely held corporation to twenty-five Delaware Subchapter S corporations, of which he was the sole stockholder, prior to the sale of those shares to the closely held corporation and that, consequently, the taxpayer had not received payment for the shares and owed no State income tax for the capital gain attributable to the amount the closely held corporation paid for them, this court concluded that, as matter of law, the evidence did not support the board's finding that the S-corporations, and not the taxpayer, had sold the stock; and, where the evidence showed that the taxpayer intended from the outset to sell his personal holdings in the closely held corporation, that the purchase and sale agreement, an assignment, and the sale all occurred within a few days, and that the transfer of stock to the S-corporations had no valid business purpose in the context of the sale, this court, disregarding the transfer of stock to the S-corporations under the so-called step transaction doctrine, concluded that the commissioner properly attributed the sale to the taxpayer and assessed a tax on the gain to him. [716-719]

APPEAL from a decision of the Appellate Tax Board.

*Eric A. Smith*, Assistant Attorney General, for the Commissioner of Revenue.

*Edward F. Hines, Jr.* (*Douglas W. Salvesen* with him) for the taxpayer.

IRELAND, J. If, in 1983, William I. Koch (William), rather than twenty-five Delaware S-corporations established by him, had sold all of William's stock in Koch Industries, Inc. (KII), to that company, William would have owed the Com-

monwealth $14,799,125 (plus interest) in income tax. William, however, attributed the gain on the sale of that stock to the S-corporations, of which he was the sole stockholder, and reported no Massachusetts tax due in connection with the sale of the stock. The Commissioner of Revenue (commissioner) attributed the sale to William and assessed a tax on the gain to him.

From that assessment, William sought an abatement, which was deemed denied by reason of the commissioner's inaction. See G. L. c. 58A, § 6, and c. 62C, § 39. An appeal to the Appellate Tax Board followed. That forum made findings of fact and concluded that William had effectively transferred his shares in KII to the Delaware S-corporations prior to the sale of those shares to the third party. Consequently, the board decided, William had not received payment for his KII shares and owed no State income tax for the capital gain attributable to the amount that KII paid for them. The commissioner sought judicial review in this court under G. L. c. 58A, § 13.

We conclude that: (1) the execution of a stock sale agreement on Saturday, June 4, 1983; (2) the placing of William's KII shares in escrow on the following Sunday, June 5, 1983; (3) the organization of the S-corporations in Delaware on June 8 and 9, 1983; (4) the assignment by William of his shares in KII on those dates; and (5) the closing of the sale on June 10, 1983, constituted a single integrated transaction executed in prearranged steps and that, as a matter of substance, William was the seller of the stock. Accordingly, the commissioner rightly assessed a tax to William and the decision of the Appellate Tax Board is to be reversed.

We summarize the facts found by the board, with some supplement from undisputed portions of the record. William, a Massachusetts resident, reported on his 1983 Federal tax return a capital gain of $275 million,[1] which he attributed to

---

[1]$275,332,555. As this appeal concerns not the amount of tax assessed but the question of whether tax is owed at all, we will use round numbers throughout. The dollar amount of the tax, $14,799,125 plus interest, if owed, is not in dispute.

twenty-five corporations incorporated in Delaware and elected tax treatment under Subchapter S of the Internal Revenue Code. He excluded the gain from his Massachusetts tax return.[2] The commissioner disallowed William's exclusion of the gain and assessed him $19 million, which included interest. Before applying for an abatement, William paid the assessment under protest.

KII is a closely held corporation founded by William's father. After their father's death, William's brother Charles, who was chief executive officer, controlled one faction; William belonged to the other. The sale of William's stock came about through settlement of a stockholders' derivative action launched by the William group.

KII, during the time in question, had holdings in oil, other energy sources, and real estate and was unusually profitable. It had assets of $3.5 billion and very little debt. Despite the company's great worth and abundant revenues, it paid small dividends. The stock could not be easily transferred. KII's articles of incorporation required a twenty-day waiting period for the transfer of shares and gave the company a right of first refusal over the sale of stock. Additional handicaps to setting a share price for KII stock were that the stock was not publicly traded and that the company did not distribute financial information.

William and Charles disagreed with some heat about how the company should be run. William thought Charles should share information and a larger measure of control with other

---

[2]Internal Revenue Code § 1366, 26 U.S.C. § 1366 (1988), allows the gains or losses from a Subchapter S corporation to be attributed to the owner as a personal gain or loss. In 1983, however, Massachusetts (see G. L. c. 62, § 2[a][2][B], as appearing in St. 1973, c. 723, § 2), did not recognize this pass-through provision and attributed income directly to the corporation. See revisions effected by St. 1986, c. 488, § 25, and St. 1988, c. 202, § 3. Because William's corporations were organized in Delaware, which assessed no. taxes against investment corporations, under Del. Code Ann. tit. 30, § 1902(b)(8) (1985), neither William nor the corporations paid any State tax on the capital gain attributed to the corporations. William did, however, pay Federal tax of $56,000,000 on the passed-through gain. He also paid a Massachusetts tax on the gain of $5,000,000 from 25,000 shares he held personally.

stockholders; according to William, Charles ran KII as if it were a one-man company. Certain of the corporation's business practices troubled William. It disturbed him that the United States Department of Energy was investigating the company for violations of Federal price-control laws and that KII had been indicted and pleaded guilty to criminal charges of stacking a lottery for oil leases. The company had also been accused of fraud in several civil suits.[3]

These concerns caused increasing friction between the two brothers. At length, Charles attempted to remove William from offices he held at KII. William responded by forming a stockholders' coalition that had a slight majority of voting stock. The majority was based on its ability to vote stock the First National Bank of Wichita held in trust for William and another shareholder. Charles was cotrustee of one trust that held a portion of that stock. As a director and major depositor, Charles had strong influence with the bank, and he used that power to induce the bank to revoke the proxies it had given William to vote the shares of stock it held in trust for him. According to William's testimony, Charles threatened, "If they don't revoke the proxies, we'll have Koch Industries buy that little bank."

After the failed coup, Charles fired William as an employee of KII, although William still remained a director. Enraged by an account of the family quarrel in Fortune magazine that compared him to the fictional television personality J.R. Ewing, Charles responded to perceived leaks of privileged information by forming an executive committee of his supporters, which took over the remaining decision-making responsibilities of KII's board of directors. William's faction sued Charles, KII, and other stockholders to force them to share power. The complaint also asserted claims of mismanagement. KII counterclaimed for libel arising out of the Fortune article.

During a protracted period of discovery, KII surprised the plaintiffs' counsel with an offer to settle the case by buying

_____

[3]See, e.g., *Koch Indus., Inc.* v. *Vosko*, 494 F.2d 713 (10th Cir. 1974).

the stock held by the dissident group. On June 4, 1983, the company agreed to repurchase the outstanding stock for $1.2 billion, and both sides agreed to drop their claims. The closing was to take place within ninety days or within forty-eight hours of written notice from the company. KII was required to place a nonrefundable $200 million deposit in escrow.

On June 8 and 9, William set up a number of corporations to spread the risk of investments he planned to make in energy, real estate, and high technology. He chose the form available under Subchapter S of the Internal Revenue Code in order to avoid the double taxation, first on corporate earnings and second on distributions to the stockholder, which ordinarily attends corporate income and distributions. Since most of his investments would be outside of Massachusetts, William set up the companies in Delaware because of that State's favorable corporate laws. In response to William's request, KII agreed to waive its restrictions on the transfer of its stock. Charles and William amended the purchase and sale agreement to allow William to assign his interest in his stock to the S-corporations so long as he and the S-corporations remained jointly and severally liable for performance of the agreement, William was the sole stockholder of the S-corporations, and William remained the principal seller. KII, in assenting to the amendment, added the qualification that no action by the S-corporations would be necessary to transfer the shares at closing.

KII assented to the amendment in writing "as of" June 8.[4] By this time, William's stock certificates had been gathered from the Wichita bank, were endorsed in blank by William and delivered to the escrow agent, as agreed. On the morning of June 9, William executed assignments of shares of KII stock to the newly-formed Delaware corporations in exchange for stock in each of those corporations. Later that day, after he had completed the assignments, he learned that KII had elected to close on the agreement the following day. William had "no idea" that KII would close so soon. The

---

[4]The executed document was sent by KII to William under letter dated June 10.

company's announcement "came as a complete surprise" to him.[5]

The closing did take place on June 10, and William instructed the escrow agent to wire the proceeds to the Delaware S-corporations. The stock certificates had been in the escrow agent's hands and were not physically delivered to the Delaware S-corporations. The closing took place as contemplated in the original purchase and sale agreement.

1. *Standard of review.* Our review of the findings of the Appellate Tax Board will be limited to questions of law. "The decision of the board shall be final as to findings of fact." G. L. c. 58A, § 13, as appearing in St. 1973, c. 1114, § 5. The credibility of witnesses, weight of evidence, and inferences to be drawn from evidence are matters for the board. *Cummington School of the Arts, Inc.* v. *Assessors of Cummington*, 373 Mass. 597, 605 (1977). We may, however, consider whether, as matter of law, the evidence is sufficient to support the board's findings. *Assessors of Weymouth* v. *Curtis*, 375 Mass. 493, 499 (1978).[6]

2. *The proper legal standard.* The commissioner claims that, as matter of law, the evidence does not support the board's finding that the S-corporations, and not William, sold the stock.[7] The commissioner may look behind a taxpayer's formal characterization of a transaction and determine that it is "unreal or a sham." *Brown, Rudnick, Freed & Gesmer* v. *Assessors of Boston*, 389 Mass. 298, 304-305 (1983),

[5]The Appellate Tax Board made a finding of fact that "available evidence shows that after [the stock certificates had been placed in escrow and assigned to the Delaware corporations William] learned that Koch Industries had sent a letter [to his attorneys and the] escrow agent notifying them that the closing would take place on June 10, 1983, at 10 a.m. . . ."

[6]This standard is elucidated in *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968), quoting from Jaffe, Judicial Control of Administrative Action 598 (1965). A court must decide "whether the finding *could* have been made by reference to the logic of experience." It will reject the finding when "the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary."

[7]The board found that William made an effective delivery of the stock to the Delaware S-corporations. One may be skeptical of that finding, but we need not disturb it in order to decide this case.

quoting from *Higgins* v. *Smith*, 308 U.S. 473, 477 (1940). Having made that determination, the government may disregard the effect of the "fiction." *Id.* at 304.

The form-over-substance analysis of a transaction is long-established in tax cases. *United States* v. *Phellis*, 257 U.S. 156, 168 (1921). *Commissioner of Corps. and Taxn.* v. *Second Natl. Bank*, 308 Mass. 1, 6 (1941). Precise labels for various approaches are elusive, and most cases have been decided on their facts and not according to any fixed mode of analysis.[8] The parties in this case discuss such doctrines as anticipatory assignment of income, the conduit theory, and step transactions. We think the most revealing way to approach this case is to determine whether the stock assignment should be disregarded as part of a step transaction.

William concedes the commissioner's right "to apply Federal tax principles in adjusting a taxpayer's Massachusetts gross income" so long as those principles are applied consistently with Federal policy. See also *DeCordova & Dana Museum & Park* v. *Director of Div. of Employment Security*, 370 Mass. 175, 180 (1976) (in the absence of contrary legislative intent, court will adhere to Federal interpretation of language of State taxation provision). We will apply the step transaction doctrine as a Federal court would do had William sought to exclude the sales proceeds from his Federal taxes. Further, the step transaction analysis is merely "part of the broader tax concept," well established in Massachusetts, "that substance should prevail over form." *American Potash & Chem. Corp.* v. *United States*, 399 F.2d 194, 207 (Ct. Cl. 1968). See Comment, Step Transactions, 24 U. Miami L. Rev. 60, 61 (1969). As William concedes that the substance-over-form doctrine was raised below, we consider

---

[8]See Bittker, Pervasive Judicial Doctrines in the Construction of the Internal Revenue Code, 21 How. L. J. 693, 705-706 (1978). "Unfortunately, it is almost impossible to distill useful generalizations from the welter of substance-over-form cases. . . . [The] uncertainty about the precedential value of a decision is often compounded by the court's failure to say whether its conclusion rests on a finding of fact that might have gone the other way if a witness had been more credible. . . ." See also *Stewart* v. *Commissioner*, 714 F.2d 977, 988 (9th Cir. 1983).

the step transaction doctrine as simply a more precise way to apply substance over form as matter of law.[9]

The board analyzed this case chiefly as an anticipatory assignment of income, as the commissioner initially invited them to do. The board then correctly focused on such factors as whether the transferor parted with control of the property or simply assigned the matured right to his profits.

The assignment of income doctrine is not wholly apposite here. That mode of analysis presupposes that the right to future income was assigned without transferring the underlying asset. *Helvering* v. *Horst*, 311 U.S. 112, 117 (1940) (anticipatory assignment of bond interest taxable to donor who kept bonds). See also *Commissioner* v. *P.G. Lake, Inc.*, 356 U.S. 260, 266-267 (1958) ("transparent" assignment of income from land taxable to assignor). Here, the board found that the asset was assigned with the income. The question before us is whether the transfer should be disregarded in substance.[10]

The step transaction doctrine, as we have suggested, "is in effect another rule of substance over form; it treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result." *Penrod* v. *Commissioner*,

---

[9]Commentators have lustily criticized the step transaction doctrine as indeterminate in scope. See, e.g., Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders par. 14.51(3), at 14-176, (5th ed. 1987); Rosenberg, Tax Avoidance and Income Measurement, 87 Mich. L. Rev. 365, 400-417 (1988). "It has been said that the step transaction doctrine 'crops up at so many points in the law of Federal taxation as to defy summary. . . .' " Comment, Step Transactions, 24 U. Miami L. Rev. at 61. There is less mystery to the step transaction mode of analysis than the critics make of it if one keeps in mind that the inquiry is to see if a series of steps attempts to masquerade what is really going on; it is a way of looking to see what transaction was *really* completed by the parties.

[10]There remains a serious question of which entity sold the stock in form. William committed personally to the sale. He sold it as president of the Delaware S-corporations. He then instructed the escrow agent, who was acting pursuant to an agreement with William personally, to wire the proceeds to the S-corporations. Even if William had been able to remove himself personally from the sale, however, the step transaction doctrine would make the assignment to the corporations a nullity for tax purposes.

88 T.C. 1415, 1428 (1987). It finds its classic exposition in *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 (1938): "A given result at the end of a straight path is not made a different result because reached by following a devious path." Where a taxpayer interposes a series of transactions in the way of a direct conveyance, primarily because of their tax consequences, courts may disregard those intermediate transactions and focus on the ultimate result.[11] Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders par. 14.51 (5th ed. 1987).

There are three common ways of applying the doctrine. The narrowest is the "binding commitment" test, whereby intermediate transactions are disregarded if, when the first is entered into, there is a binding commitment to take the later steps. *Commissioner* v. *Gordon*, 391 U.S. 83, 96 (1968).[12] More easily satisfied is the "interdependence" test, which seeks to determine whether the steps are so closely connected that one would be fruitless without the completion of the series. *Redding* v. *Commissioner*, 630 F.2d 1169, 1177 (7th Cir. 1980). Most far-reaching is the "end result" test, where "it appears that formally separate steps are really prearranged parts of a single transaction intended from the outset to reach the ultimate result." *Penrod* v. *Commissioner*, 88 T.C. at 1429. See also *King Enterprises, Inc.* v. *United States*, 418 F.2d 511, 516 (Ct. Cl. 1969).

In analyzing whether the step transaction doctrine applies, courts focus on several factors. Those relevant here are in-

[11]The conduit theory relied on by the commissioner is closely related to this doctrine. In *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), a corporation agreed to sell a building and passed title to the shareholders, who consummated the sale. In disregarding the tax effects of that intermediate transfer because it was a "conduit," the court said, "[T]he transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant." *Id.* at 334.

[12]Where *Gordon* has been limited, it is because to require a "binding commitment" would restrict the applicability of the step transaction doctrine. Often, such a commitment is seen as a factor indicating that the doctrine is appropriate. *Security Indus. Ins. Co.* v. *United States*, 702 F.2d 1234, 1245 (5th Cir. 1983).

tent, temporal proximity (timing), and independent economic significance (business purpose). First, a court will not usually collapse the transaction if it can be shown that the subsequent transactions were unintended, or that they resulted from factors beyond the taxpayer's control.[13] *Penrod* v. *Commissioner*, 88 T.C. at 1437 (petitioners did not intend to sell stock when they acquired it, and purchase and sale were neither interdependent steps nor directed toward end result). The closer in time the transactions occur, the more likely it is that they will be stepped together. *Campbell* v. *Commissioner*, 15 T.C. 312, 320-321 (1950) (time element "may show, with other evidence, a preconcerted arrangement in spite of denials by interested parties"). Timing is not determinative, however, when a taxpayer can show a valid business purpose. *Reef Corp.* v. *Commissioner*, 368 F.2d 125, 134 (5th Cir. 1966), cert. denied, 386 U.S. 1018 (1967) ("test of whether events should be viewed . . . as part of a single plan is not temporal but is functional"). But compare *Associated Wholesale Grocers, Inc.* v. *United States*, 927 F.2d 1517, 1526-1527 (10th Cir. 1991) (valid business purpose, while a factor to be considered, does not bar application of step transaction doctrine).

No matter which test is applied to the facts of this case, the assignment of securities to the Delaware S-corporations must be disregarded under the step transaction doctrine. First, William's binding commitment to sell the stock was in no way affected by the assignment. That step's only function was to place the proceeds beyond the control of the Massachusetts taxing authorities. Second, the assignment was functionally interdependent of the deal. It would have been fruitless, and probably impossible, to transfer the stock if its imminent sale had not been contemplated by the parties. Over the years, Charles Koch had steadfastly controlled the disposition of the KII stock as a trustee, a director of the

---

[13]The commissioner has argued that the board misapprehended the burden of proof. William concedes that the burden of proof lies with the taxpayer. *M & T Charters, Inc.* v. *Commissioner of Rev.*, 404 Mass. 137, 140 (1989).

First National Bank of Wichita, and CEO of a company whose articles of incorporation restricted the sale of its stock. Suddenly, he allowed William to transfer it to the Delaware S-corporations on the day before KII redeemed it but only on condition that William guaranteed delivery of the stock, which was already in the hands of an escrowee. The evidence, viewed by the logic of experience, indicates that, unless Charles was certain that the deal would close, he would not have granted the amendment his brother sought, would not have allowed the bank to execute the joinder agreements, and would not have caused the corporate by-laws to be waived. Without these concessions, there could have been no assignment to the Delaware S-corporations. Third, William intended the ultimate result that the stock be sold to KII. He never planned that the S-corporations would hold the stock for more than ninety days or that they would use it for any business purpose. The corporations were intended only to deal with the cash proceeds from the sale.

The evidence shows that William intended from the outset to sell his personal holdings in KII, that the purchase and sale agreement, the assignment, and the sale occurred within a few days of each other, and that the transfer of stock to the Delaware S-corporations had no valid business purpose in the context of the sale.

a. *Intent.* William's signature on the agreement to sell the stock to KII was a binding commitment that certainly indicated his intent, and he continued to be personally bound by the amendment that allowed him to convey the stock to the S-corporations. His testimony that he was "deathly afraid" that the deal would not go through underscores his hope that it would succeed. True, many factors in the sale were beyond his control, but the stock transfer was arranged with a view to the transaction that William intended to occur. *Campbell v. Commissioner*, 15 T.C. at 320-321 (court focused on seller's intent at signing stock transfer agreement, and it was insignificant that buyer's intent changed before closing).

b. *Timing.* The fact that the closing occurred the day after the assignment, in light of the other facts, provides substan-

tial evidence that the Delaware corporations played a part in a preconceived scheme. *Love* v. *Commissioner*, 113 F.2d 236, 238 (3d Cir. 1940) (liquidation was "demonstrated" to be step in plan of reorganization by the fact that old company decided to liquidate on same day that new corporation with same owners agreed to buy assets in exchange for stock); *Kuper* v. *Commissioner*, 533 F.2d 152, 158 (5th Cir. 1976) (disregarding step that was "momentary stopover" unneccessary to desired exchange of assets).

c. *Business purpose.* It may be granted that the S-corporations had a valid business purpose. Indeed, the board found that the assignment was "in pursuit of [William's] long-range investment and business objectives outside Massachusetts." But there was nothing in the assignment of the stock that advanced those objectives in any way. If that step had been eliminated and the cash proceeds for the KII stock had been wired to the S-corporations on William's behalf, the business result would have been the same. See *Recklitis* v. *Commissioner*, 91 T.C. 874, 898-900 (1988) (when he negotiated stock sale on his own behalf, transferred stock to his corporation, then had corporation sell stock, taxpayer failed to show that corporation sold stock for its own benefit).

William never intended the Delaware S-corporations to end up with the KII stock. He contemplated a sale to KII and interposed the assignment of stock to the S-corporations as a step that was meaningless in the context of the ultimate result. Whatever purpose the S-corporations may have served in Koch's eventual business plans, he has shown no reason, apart from tax avoidance, for transferring the stock one day before performing his agreement to sell it.[14] The assignment of stock to the Delaware S-corporations is therefore to be dis-

---

[14]It is axiomatic that a taxpayer may arrange his affairs so as to minimize his taxes. *Gregory* v. *Helvering*, 293 U.S. 465, 469 (1935). We simply conclude that William's assignment to the S-corporations was no more than a momentary stopover in a prearranged sale of stock, without any business purpose beyond the avoidance of taxes.

regarded for tax purposes, and the decision of the Appellate Tax Board is reversed.

*So ordered.*