**BROADVIEW LUMBER CO., INC.,**
**Plaintiff-Appellant-Cross-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellee-Cross-Appellant.**

**BROADVIEW LUMBER CO., INC., Successor-In-Interest by Statutory Merger to Allen County Lumber Co., Inc., Plaintiff-Appellant-Cross-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellee-Cross-Appellant.**

Nos. 76–2100, 76–2101, 76–2159 and 76–2160.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1977.
Decided Aug. 29, 1977.

Myron C. Baum, Acting Asst. Atty. Gen., Ernest J. Brown, Atty., Tax Div., Dept. of Justice, Washington, D.C., Richard L. Kieser, U. S. Atty., Fort Wayne, Ind., for U.S.A.

James R. Solomon, Fort Wayne, Ind., Lester M. Ponder, Indianapolis, Ind., for Broadview Lumber.

Before SWYGERT and BAUER, Circuit Judges, and JAMESON,* Senior District Judge.

JAMESON, Senior District Judge:

This appeal involves the tax consequences of a merger of a parent corporation into its subsidiary, brought about by the subsidiary's purchase of the parent's stock with insurance proceeds received from the involuntary conversion of the subsidiary's assets through fire. The taxpayer, Broadview Lumber Company, brought two suits to recover federal income taxes—one (No. 73 F 104) to recover taxes paid for its taxable years 1967, 1968 and 1969 in the amount of $51,900.06, and the other (No. 73 F 105) to recover taxes paid in its capacity as successor in interest by statutory merger to Allen County Lumber Company for Allen's taxable year 1968 in the amount of $32,503.19. The issues presented center on the provisions of sections 1033 (involuntary conversions), 304 (redemption of stock through related corporations), and 334 (basis of property received in liquidation) of the Internal Revenue Code of 1954.

The facts were stipulated and the two cases consolidated for trial. The district court entered summary judgment for the Government in 73 F 105, holding that Allen received a constructive dividend upon Broadview's purchase of its outstanding shares of stock, and that Broadview, as Allen's successor, was liable for the tax. Summary judgment was entered for Broadview in 73 F 104, the court holding that section 1033 prohibited recognition of gain to Broadview upon receipt of the fire loss insurance proceeds. The court held further, however, that the assets acquired from Allen should have been recorded by Broadview at a cost basis (with adjustments) instead of a carry-over basis.

Broadview appeals from the judgment in 73 F 105 and that portion of the judgment in 73 F 104 holding that it was not entitled to record the assets of Allen received under the merger on a carry-over basis. The Government cross-appeals in 73 F 104 insofar as any refund was allowed.

We conclude that Broadview should prevail on all issues and accordingly reverse the judgment of the district court in 73 F 105 and affirm, as modified herein, the judgment in 73 F 104.

*Factual Background*

Broadview Lumber Company and Allen County Lumber Company were competitors engaged in the business of selling lumber products in Allen County, Indiana and the surrounding area. On April 20, 1968, substantially all of Broadview's assets, having an adjusted basis of $230,943.16, were destroyed by fire. Broadview received insurance proceeds in the amount of $413,210.28, thus realizing a gain of $182,267.11 on the involuntary conversion. At the time of the fire, 634 of Broadview's 1,000 shares of common stock were owned by Allen. Of Allen's 780 common shares, 365 were owned by the Fisher family and 415 by the Johnson family.[1]

---

* The Honorable William J. Jameson, United States Senior District Judge for the District of Montana, is sitting by designation.

1. The ownership of Allen's stock was as follows:

Desiring to avoid recognition of the gain arising from the involuntary conversion, Broadview sought to reinvest the insurance proceeds in property similar to that destroyed by the fire and to that end decided to attempt to gain control of Allen. Pursuant to this plan Allen redeemed the 365 shares of its stock owned by the Fisher family for $1,000 per share, leaving the 415 shares owned by the Johnson family outstanding. On June 8, 1968, Broadview's directors authorized payment of $415,000 to the Johnson family for its stock in Allen. Payment for this stock was made on June 11. On June 12, the directors of Broadview approved the merger of Allen into Broadview. All the assets and liabilities of Allen were transferred to Broadview effective June 15, 1968. The effect of these transactions was that Broadview, a subsidiary of Allen, became Allen's parent corporation for a short period of time and then the surviving corporation following the merger.

Following the merger, Broadview recorded the assets received from Allen as having the same basis which they had in Allen's hands, without reduction for the gain realized as a result of the involuntary conversion. Broadview did not report the $182,-267.12 gain on its federal income tax return for its fiscal year ending November 30, 1968, but treated the gain as subject to nonrecognition under section 1033. After audit, the District Director of Internal Revenue held that the gain must be recognized. The Director also held that the $415,000 paid by Broadview to Allen's shareholders must be treated as a constructive dividend from Broadview to Allen under section 304(a)(2). Broadview paid the resulting deficiency assessments [2] and filed administrative claims for refund. Subsequently these refund suits were filed pursuant to 28 U.S.C. § 1346(a)(1).

### Issues on Appeal

1. Did Allen receive a taxable dividend under section 304(a)(2) upon the purchase by Broadview, Allen's subsidiary, of Allen's stock?

2. Was Broadview entitled to treat its involuntary gain as nonrecognizable under section 1033?

3. Was the proper basis for the assets received by Broadview from Allen the acquisition cost rather than the carry-over basis?

### I. The Constructive Dividend Issue (No. 73 F 105)

The district court found that under sections 304(a)(2) and (b)(2)(B) [3] "Allen County received a constructive dividend in the amount of $415,000 upon the purchase of its shares by Broadview from the Johnsons". The court relied upon the holding of the Tax Court in *Union Bankers Insurance Co.*, 64 T.C. 807 (1975). The Tax Court

| Shareholder | Relationship | Shares |
|---|---|---|
| A. M. Fisher | | 222 |
| A. M. Fisher, Jr. | Son of A. M. Fisher | 69 |
| Vera M. Fisher | Mother of A. M. Fisher | 74 |
| John H. Johnson | | 273 |
| Richard Johnson | Son of John H. Johnson | 70 |
| Marion Johnson | Daughter of John H. Johnson | 72 |
| | | 780 |

2. Broadview was liable for the assessment arising from the constructive dividend because it was the successor in interest to Allen.

3. § 304 provides in pertinent part:

§ 304. Redemption through use of related corporations.
(a) Treatment of certain stock purchases—

\* \* \* \* \* \*

(2) Acquisition by subsidiary—For purposes of sections 302 and 303, if—

(A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and
(B) the issuing corporation controls the acquiring corporation,
then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

\* \* \* \* \* \*

(b) Special rules for application of subsection (a)—

\* \* \* \* \* \*

(2) Amount constituting dividend.—
(B) Where subsection (a)(2) applies.—In the case of any acquisition of stock to which subsection (a)(2) of this section applies, the determination of the amount which is a dividend shall be made as if the property were distributed by the acquiring corporation to the issuing corporation and immediately

there held that under these statutory provisions if a subsidiary corporation purchases shares of its parent corporation from one of the parent's shareholders, the parent corporation receives a taxable constructive dividend.[4]

Subsequent to the decision of the district court, however, the Tax Court, with the full court sitting,[5] decided *Helen M. Webb*, 67 T.C. 293, No. 24 (Nov. 24, 1976). The Tax Court there held that a parent corporation did not realize a constructive dividend under the provisions of section 304 upon the purchase of its stock by a subsidiary. The court expressly stated that it would "no longer follow the reasoning of *Union Bankers* or *Broadview Lumber Co. v. United States*".[6] *Webb* was followed in *Virginia Materials Corp.*, decided December 2, 1976, 67 T.C. 372, No. 29, under a factual situation very similar to the instant case.

The Government argues that *"Union Bankers* was correctly decided, and that the Tax Court erred in its *Webb* and *Virginia Materials* decisions". Both parties here and the Tax Court in its decisions rely upon the language and legislative history of section 304. As the Tax Court noted in *Virginia Materials*, the issue "is a narrow one of statutory construction", and "[r]esolution of the issue turns on whether the application of section 304(a)(2) as supplemented by section 304(b)(2)(B) is limited to determining tax consequences to the selling shareholder, or whether the cited sections, when applicable, also construct a taxable intercorporate distribution from the purchasing subsidiary to its parent". (Op. at 6–7).

In 1950, Congress added section 115(g)(2), the predecessor of section 304, to the Internal Revenue Code of 1939 in response to a loophole created by judicial interpretation of section 115(g) of the 1939 Code. Section 115(g) imposed a tax upon corporate stock redemptions which were essentially equivalent to the distribution of a taxable dividend. In *Rodman Wanamaker Trust*, 11 T.C. 365 (1948), *aff'd sub nom.* 178 F.2d 10 (3 Cir. 1949), the Tax Court held that 115(g) was applicable only where a corporation cancels or redeems its own stock; it was not applicable where a subsidiary corporation purchased the stock of its parent corporation from the parent corporation's shareholders. Thus by indirect redemption corporations were able to circumvent the tax imposed by section 115(g) and still achieve essentially the same results as by direct redemption.

Congress responded by providing in section 115(g)(2) for treatment of the amount paid for the acquisition of the parent, issuing corporation stock as:

\* \* \* a taxable dividend from the issuing corporation to the extent that the amount paid for such stock would have been considered under paragraph (1) [of section 115(g)], as essentially equivalent to a taxable dividend if such amount had been distributed by the acquiring corporation to the issuing corporation and had been applied by the issuing corporation in redemption of its stock.[7]

The substance of section 115(g)(2) was incorporated into the 1954 Code as section 304(a)(2), which was supplemented by sec-

thereafter distributed by the issuing corporation.

4. The district court noted that *Union Bankers Insurance Co.*, decided by Judge Scott, was the "only judicial authority cited by either party".

5. With 16 judges hearing the case, there was only a single dissent, Judge Scott, who wrote the opinion in *Union Bankers*.

6. No. 73 F 105.

7. The House Report on section 115(g)(2) noted:
If the stockholders of a corporation which owns all the stock of a subsidiary corporation obtain cash from that subsidiary, in ef-

fect they have received a dividend to the same extent as would be the case if the cash had been paid by the subsidiary to the parent corporation and had then been distributed by the parent to the stockholders. And where such stockholders "sell" part of their stock in the parent corporation to the subsidiary they nevertheless retain ownership and control of both corporations, since the "sold" stock is one of the assets which the parent corporation owns by virtue of its possession of all the stock of the subsidiary. H.R.Rep. No. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 380, 420.

tion 304(b)(2)(B). (See note 3) In a careful analysis of the language of that section and its legislative history the Tax Court concluded in *Webb* that the section "merely creates a series of fictions which are to be applied in order to close the loophole revealed by the *Wanamaker* opinion. Under that section the payment of the selling price is 'treated' as a 'distribution in redemption' of the parent corporation's stock. The stock is not actually redeemed but becomes an asset of the subsidiary corporation. . . . These fictions do not change the reality that the parent's stock is not actually redeemed." (Op. at 29–31). We agree.

Congress chose to treat the acquisition as a redemption by the parent corporation, and as such the transaction would be measured by the "essentially equivalent to a dividend" standards of 115(g)(1) to determine the tax consequences. The extent of any dividend was based upon treating the amount paid *as if* it passed first to the issuing corporation and then to the shareholder. Nothing in the statutory language describing this fictionalized treatment of the amount paid gives any indication that Congress intended the fictional distribution from the subsidiary to the parent also to be a taxable dividend to the parent.

That Congress intended this fictional redemption treatment solely for the specific and limited purpose of closing the loophole created by *Wanamaker* is apparent from the Congressional reports which accompanied the addition of 115(g)(2) to the Code. The House Report stated that the amendments would add paragraph (2) to section 115(g) "to require the application of section 115(g)(1)" to such indirect redemptions; that this special treatment of indirect redemptions was "for the purposes of section 115(g)(1)". The amount paid for the stock was not actually distributed to the parent corporation, but only "as though it had been". H.R.Rep.No. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 380, 440; accord, S.Rep.No. 2375, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 483, 541–42, [1950] U.S.Code Cong.Serv., p. 3053. Because section 115(g)(1) was concerned only with taxation of the shareholder and not taxation of the parent corporation, the effect of the fictional distribution and redemption was limited to creating a potential taxable dividend to the shareholder. We find no indication that Congress intended the distribution to have any tax consequences beyond those expressly imposed in that section.

Section 304 of the Internal Revenue Code of 1954 incorporated the provisions of section 115(g)(2) and enlarged upon that section to provide for redemption treatment of stock transactions between brother-sister corporations as well as between parent-subsidiary corporations. The committee reports which discussed the provisions of section 304 made it clear, however, that their essential purpose remained: "The effect of the operation of section 304 is to characterize as redemptions distributions which are cast in the form of sales". S.Rep.No. 1622, 83d Cong., 2d Sess. (1954), [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4876. Section 304(a)(2) provides that the property given by a subsidiary corporation in exchange for stock of its parent shall be *treated* as a distribution in redemption by the parent. That fictional redemption treatment of the transaction purports to bring it within the terms of sections 301 to 303 of the Code, which determine the taxability of all corporate distributions to shareholders, including distributions in redemption of stock. As with its predecessor, section 115(g)(2), nothing in the statutory language of section 304 evidences any intention by Congress to impose a tax upon the parent corporation as well.

Sections 301 to 303 are concerned solely with the taxability of amounts directly received by the shareholder. Treated as a distribution in redemption, the transaction is first measured by the standards of sections 302 and 303 to determine whether the distribution resulted in capital gain or whether it was essentially equivalent to a dividend and resulted in ordinary income. If the sale proceeds meet one of the requirements of section 302(b) or the requirements of section 303, then the amount realized by the shareholder is treated as a capital gain or loss. If not, then by virtue of

section 302(d), the sale proceeds are treated as a distribution from the parent to the shareholder, and section 301 applies to measure the amount of those proceeds which is a dividend and the amount which is applied against basis.

In those cases where the proceeds are not afforded capital gains treatment, section 304(b)(1)(B) provides a means of determining the amount of the fictional redemption which constitutes a dividend. It provides that the determination is made *as if* the property were distributed by the subsidiary to the parent and immediately thereafter distributed by the parent in redemption of its stock. This second fictional treatment of the sale proceeds provides earnings and profits to the parent corporation from which the dividend to the shareholder may be derived. The Government argues that this treatment of the sales proceeds evidences Congress' intention that section 304 serve dual functions: (1) preventing controlling shareholders from drawing off accumulated earnings and avoiding dividend treatment; and (2) preventing parent corporations from using a subsidiary corporation's funds to redeem its own stock without being taxed on the use of those funds. The latter goal, however, is not supported by anything in the language or legislative history of section 304. We agree with the opinion of the Tax Court in *Webb*:

> . . . [R]espondent's argument takes the quoted words out of context and ignores both the legislative history and the substantive thought conveyed by section 304(a)(2) and (b)(2)(B). The function of section 304(a)(2) and (b)(2)(B) is to insure

that the redemption-distribution provisions of sections 301 through 303 are not circumvented by a sale of a parent's stock to a controlled subsidiary. . . . [Section 304(b)(2)(B)] is simply a mechanism by which earnings and profits of the parent corporation are adjusted for the purpose of *"the determination of the amount which is a dividend".* (emphasis added) It has nothing to do with the amount of the income of the parent. *Helen M. Webb,* 67 T.C. 293, No. 24, slip op. at 25–26 (Nov. 23, 1976).

As the Tax Court noted in *Webb,* the Treasury Department's own regulations support and confirm this interpretation of the section.[8] The relevant regulations demonstrate that the fictional distribution of sales proceeds from the subsidiary to the parent comes into play only if the transaction fails to qualify for capital gains treatment, and, pursuant to section 302(d), it has to be characterized as a distribution to which section 301 applies. Treas.Reg. § 1.304–3(a) (1955).

The heading to section 304(b)(2) lends support to this view of the statutory scheme.[9] The section is entitled "Amount constituting dividend". Those words match the heading of section 301(c)(1) and thus the fictional distribution created by section 304(b)(2)(B) may be presumed to refer to the calculations required in section 301(c)(1).[10]

The Government further contends that even normal dividend analysis should lead to the conclusion that the parent corpora-

---

**8.** Treasury regulations interpreting revenue statutes are not conclusive authority, but they are entitled to great weight. *E. g., Carlisle v. Commissioner of Internal Revenue,* 165 F.2d 645, 648 (6 Cir. 1948). This is particularly true when a regulation has been in effect for a substantial length of time. See *Marsack's Estate v. Commissioner of Internal Revenue,* 288 F.2d 533 (7 Cir. 1961).

**9.** A statute's headings are aids in ascertaining its meaning. *Maguire v. Commissioner of Internal Revenue,* 313 U.S. 1, 9, 61 S.Ct. 789, 85 L.Ed. 1149 (1941); *John Bell Keeble, Jr.,* 2 T.C. 1249, 1253 (1949).

**10.** Part (A) of section 304(b)(2) parallels part (B) of that section and states rules for determining the "Amount constituting dividend" in cases involving brother-sister corporations, instead of parent-subsidiary corporations. That part specifically refers to the earnings and profits of the acquiring corporation as the basis for any dividend determinations. Because in a parent-subsidiary situation it is the issuing or parent corporation, not the acquiring corporation, which is treated as redeeming the stock, the Code simply adopts another fictional method for providing earnings and profits to the issuing corporation.

tion had received a taxable dividend.[11] The district court held that Allen had received a constructive dividend even though no money had passed to it because Broadview in buying Allen's stock had discharged an obligation of Allen which benefitted Allen. On appeal, the Government has broadened the basis of its contention. It argues that constructive dividend treatment is not limited to cases where a corporation has discharged an obligation of a shareholder; if a corporation provides money or other benefits to a shareholder the transaction gives rise to a constructive dividend even though the money or other benefits never pass directly through the shareholder's hands.

We have no quarrel with these general propositions regarding constructive dividends. They are amply supported by precedent. See, e. g., *Walker v. Commissioner of Internal Revenue*, 362 F.2d 140, 143 (7 Cir. 1966). Corporate earnings may constitute dividends even though no dividend is formally declared, nothing is recorded as a dividend on the corporate books, and the distribution is not proportional to stockholdings of each shareholder. *Paramount-Richards Theatres, Inc. v. Commissioner of Internal Revenue*, 153 F.2d 602, 604 (5 Cir. 1946). We do not agree, however, that those general propositions apply to the specific facts of this case, involving these particular statutory provisions. Unless something of measurable value has passed to the shareholder there is no constructive dividend. *Wilkinson v. Commissioner*, 29 T.C. 421 (1957). The Fifth Circuit Court of Appeals has held: "[N]o dividend can be constructive unless there is a 'distribution' to the individual. Thus, it is essential to the

existence of a dividend, actual or constructive, that the stockholder receive something from the corporation." *Sammons v. Commissioner of Internal Revenue*, 472 F.2d 449, 453 (5 Cir. 1972).

Here any benefit that Allen might have obtained from Broadview's purchase of Allen stock is purely derivative. Allen did not actually receive anything either directly or indirectly as a result of the exchange. Allen's balance sheet was not affected by the purchase; it still had the same number of shares outstanding as before the purchase. The language of section 304(b)(2)(B) does not convert the sale into an actual distribution by Broadview to Allen; it does not alter the actual earnings and profits of Allen. It only creates a fiction to aid determination of the amount constituting a dividend should the exchange not qualify for capital gains treatment.

The language in section 304(b)(2)(B) is simply the second in a series of fictions created in section 304 for the purpose of closing the loophole revealed by *Wanamaker*. The first fiction is created by section 304(a)(2), which treats the sales proceeds as if they were distributed by the parent corporation in redemption of its stock. But, as with the second fiction, the parent corporation does not actually receive anything or actually redeem its stock. Instead, the stock becomes an asset of the acquiring subsidiary which pays the purchase price to the shareholder. These statutory fictions do not alter the reality of the transactions involved here; Allen did not actually redeem its stock when its shareholders sold to Broadview and Broadview did not actually

---

11. In the district court the Government relied upon a revenue ruling for support of its position. That ruling, Rev.Rul. 69–261, 1969–1 C.B. 94, provided that a purchase by a wholly owned subsidiary of the stock of its parent results in a constructive dividend to the parent. The Government has apparently abandoned its reliance on that ruling because it has failed to cite it in its briefs on appeal. The ruling has been severely criticized by tax commentators as "a questionable interpretation of the statute". Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, § 9.31 at 9–39, n. 67 (1971). Another commentator

states: "The validity of that ruling is doubtful, since the apparent purpose of the provision in section 304(a)(2) is to measure the amount which is to be treated as a dividend to the transferor, and it is unlikely that Congress contemplated treating the constructive distribution to the parent as income to the parent." Kahn, Basic Corporate Taxation 54 (1973). Even if the Government had relied upon that ruling we would not be obliged to follow it as revenue rulings are not binding upon the courts. See, e. g., *Virginia Materials Corp.*, 67 T.C. 372, No. 29, slip. op. at 10 (Dec. 2, 1976).

distribute anything to Allen when it paid the purchase price to them.

Imposition of a tax upon the fictional distribution to a parent corporation which results from a fictional redemption would be to read too much into the language of section 304.[12] If Congress had so intended, we believe it would have made it clear by expressly labelling these fictional intercorporate distributions as taxable dividends. Instead it chose to create these fictions in order to preserve the tax framework of sections 301 to 303 by making those sections applicable to the type of transactions described in sections 304(a)(1) and (2).[13]

We are persuaded that the Tax Court correctly held in *Webb* and *Virginia Materials,* both decided subsequent to the opinion of the district court in this case, that a parent corporation does not realize a constructive dividend under section 304 upon the purchase of its stock by a subsidiary.

(73 F 104)

## II. *Nonrecognition of Gain Under Section 1033*

■ The district court held that Broadview's purchase of the 415 outstanding shares of Allen from Johnson entitled Broadview to treat the gain it realized on the involuntary conversion as non-recognizable under section 1033. Section 1033 provides that in the event of an involuntary conversion of the taxpayer's property the taxpayer does not recognize any gain if the property is converted, within a specified time, into property "similar or related in service or use". If the property is converted into money, no gain is recognized if the taxpayer uses the money to purchase other property similar or related in service, or to purchase stock in the acquisition of control of a corporation owning such property. The district court agreed with Broadview that in purchasing all the outstanding stock of Allen, a competing lumber business, it had acquired control of a corporation owning property similar or related in service to the property which had been involuntarily converted on account of the fire. Thus, Broadview owed no tax on the gain it realized from the conversion.

The Government contends that Broadview did not "purchase" the shares of Allen within the meaning of section 1033(a)(3)(A)(ii), which provides:

(ii) The taxpayer shall be considered to have purchased property or stock only if, . . . the unadjusted basis of such property or stock would be its cost within the meaning of section 1012.

Because Broadview acquired the Allen stock through an exchange of money for stock, normally, under section 1012, Broadview's basis would be its cost. The Government argues, however, that section 304(a) (see note 3, *supra*), requires treatment of the stock as if it were a contribution to capital. As a contribution to capital, under section 362(a) the basis of the Allen stock in Broadview's hands would not be its cost, but instead would be the same as the basis of the stock in the hands of the transferor.

The critical link in the Government's reasoning is its interpretation of the language of section 304(a). This section deals with

---

**12.** Even if we were to hold that the section 304(b)(2)(B) fictional distribution were a taxable dividend to the parent, we do not believe that on the facts of this case there would be any tax imposed. Our reading of the statute, accompanying regulations, and relevant legislative history leads us to conclude that 304(b)(2)(B) comes into play to determine the amount of the dividend only if sections 302 and 303 do not afford the fictional redemption capital gains treatment. Only then would there be any fictional distribution to the parent at all. See, *e.g.,* Treas.Reg. § 1.304–3(a) (1955). Because here the "safe harbor" provision of 302(b)(3) would give the Johnson family capital gains treatment for their sale of Allen stock, there would be no fictional distribution under section 304(b)(2)(B) from Broadview to Allen which could be taxed.

**13.** 1 Mertens, Law of Federal Income Taxation § 9.106 at 363 states: "This constructive dividend from the subsidiary to the parent appears to be only for the purpose of increasing the earnings and profits of the parent corporation and apparently is not an intercompany dividend to be included in the gross income of the parent corporation". See generally authorities cited *supra* note 11.

"Treatment of certain stock purchases". Section 304(a)(1) covers "Acquisition by related corporation (other than subsidiary)" and contains the provision that, "In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation". Section 304(a)(2) governs "Acquisition by subsidiary". It does not contain the language of 304(a)(1) beginning, "In any such case".

The Government interprets the final sentence of section 304(a)(1), beginning with the words, "In any such case," to mean that the stock acquired both in transactions involving related or brother-sister corporations under subsection (1) and in transactions involving parent-subsidiary corporations under subsection (2) is deemed to be a contribution to capital of the acquiring corporation.[14] Although the parenthetical references in the title and in the first sentence of subsection (1) seem to clearly differentiate between the applicability of that subsection and subsection (2), the Government contends that the parentheticals only distinguish the case of a subsidiary acquiring a parent corporation's stock for the purpose of determining which corporation's stock is treated as redeemed. It argues that the parentheticals do not differentiate for purposes of applying the contribution to capital rule because that rule is applicable "in any such case".

The Government seeks support for this position in the attribution of control rules contained in section 304(c).[15] Under those rules, Broadview's acquisition of Allen's stock fits within both subsection (1) and subsection (2) because the Johnson family would be deemed to be in control of both Allen and Broadview.[16] Thus the relationship between the two corporations can be viewed as either parent-subsidiary or brother-sister. The Government interprets subsection (1) to be broad and all-inclusive, containing rules that apply to both situations, whereas subsection (2) merely contains a special rule for the redemption treatment of a parent's stock acquired by a subsidiary.

We recognize that the attribution rules of section 304(c) generate novel and paradoxical interpretive problems.[17] We cannot agree, however, with the Government's resolution of those problems and its interpretation of the effect that the concluding sentence of section 304(a)(1) has upon the applicability of section 1033 to Broadview's purchase of the Allen stock. Our disagree-

14. The Government's argument here differs from its argument in the district court. There the government did not argue that the sentence beginning with "In any such case" found in section 304(a)(1) applied as well to paragraph (2). It contended instead that because Allen had received a constructive dividend from Broadview, Broadview must be held to have received the stock from Allen as a contribution to capital.

15. Section 304(c) provides:
"(1) In general.—For the purposes of this section, control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock. If a person (or persons) is in control (within the meaning of the preceding sentence) of a corporation which in turn owns at least 50 percent of the total combined voting power of all stock entitled to vote of another corporation, or owns at least 50 percent of the total value of the shares of all classes of stock of another corpo-

ration, then such person (or persons) shall be treated as in control of such other corporation. "(2) Constructive ownership.—Section 318(a) (relating to the constructive ownership of stock) shall apply for purposes of determining control under paragraph (1). For purposes of the preceding sentence, sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein."

16. The constructive ownership rules of section 318(a), incorporated by reference into section 304(c), attribute ownership of the Broadview stock which was owned by Allen to the Johnson family who were at that time 100 percent owners of Allen.

17. In another context, tax commentators have noted how the attribution rules of section 304(c) have the effect of making every brother-sister corporate relationship fall within the definition of parent-subsidiary as well. See 1 Mertens, Law of Federal Income Taxation, § 9.106 at 363 (1974).

ment is based upon the legislative history of section 304 and its predecessor in the Internal Revenue Code of 1939, section 115(g)(2). As noted above, 115(g)(2) was enacted for the specific and limited purpose of closing a loophole in section 115(g) which had been revealed by the *Wanamaker* decision. The House version of the 1950 amendments to section 115(g) purported to bring both purchases by a subsidiary corporation of its parent's stock and purchases by a brother corporation of its sister's stock within the framework of that section. The House Report said that the addition of paragraph (2) would "require the application of the principles of section 115(g) of the Code to cases where the acquisition of stock is made by a corporation controlled by the issuing corporation, or controlled by the same interests as control the issuing corporation". H.R. Rep. No. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 380, 444. The report made clear, nonetheless, that the bill created two distinct fictional treatments of the amount paid for the stock in the two types of cases covered.[18]

The Senate version of the bill maintained a distinction between the treatment of parent-subsidiary and brother-sister transactions. The House provision for extending the application of section 115(g) to cases where both the issuing and the acquiring corporation are controlled by the same interests was eliminated. The Senate Finance Committee was not convinced that the effect of a brother corporation acquiring the stock of a sister corporation was the same as a redemption by the issuing sister corporation and therefore decided it was not necessary to require the same redemption treatment of such transactions as it had for a subsidiary's acquisition of its parent's stock. S.Rep. No. 2375, 81st Cong., 2d

Sess. (1950), 1950–2 C.B. 483, 514–15, [1950] U.S.Code Cong.Serv., p. 3053.

Section 304 expanded section 115(g)(2) to include the brother-sister cases which the Senate had eliminated from 115(g)(2). In the House bill, brother-sister cases and parent-subsidiary cases were given the same fictional treatment.[19] The Senate version, however, which eventually became law, provided for separate and distinct fictional treatments. The differentiation between the two is apparent from the Senate Report. The Report says that paragraph (1) of section 304(a), relating to "brother-sister corporations," sets forth the "*new* general rule," whereas paragraph (2), relating to the parent-subsidiary area, sets forth "the general rule of *present* law". (Emphasis ours). S.Rep. No. 1622, 83d Cong., 2d Sess. (1954), [1954] U.S.Code Cong. & Admin. News 4621, 4876–77. The new general rule for brother-sister stock transactions was the rule originally proposed by the House for both brother-sister and parent-subsidiary stock transactions, that the stock was to be treated as redeemed by the acquiring corporation. The "rule of present law" for parent-subsidiary stock transactions was that the stock was treated as redeemed by the issuing corporation.

The limited legislative history of section 304(a) indicates that Congress intended the statute's discrete treatment of the two types of stock transactions to extend to the fictional capital contribution as well as the fictional redemption. The rule of present law, section 115(g)(2), which the Senate Report said was "preserved" in section 304(a)(2), neither explicitly nor implicitly treated a subsidiary's acquisition of stock in its parent as a contribution to the subsidiary's capital. In discussing that section's treatment of such acquisitions the Senate

---

18. In a parent-subsidiary case, the amount was to be treated as though distributed by the subsidiary to the parent and then applied by the parent in redemption of its stock. In a brother-sister case, the amount was treated as though distributed by the issuing corporation in redemption. Then the stock was deemed to be sold by the issuing corporation to the acquiring corporation. H.R.Rep. No. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 390, 444–45.

19. The House report said: "In each of the instances specified, purchases of the stock of one corporation by another are treated under section 304 as if the purchasing company had redeemed its own stock directly from its shareholders." H.R.Rep. No. 1337, 83rd Cong., 2d Sess. (1954), [1954] U.S.Code Cong. & Admin. News 4017, 4216.

Report described how the proceeds of the sale of the stock were to be considered first a distribution to the parent and then a distribution by the parent in redemption of its stock, but made no mention of the contribution to capital rule. In contrast, when discussing the "new" rule for brother-sister transactions, the Report specifically described how the stock acquired was to be treated as a contribution to the capital of the acquiring corporation. When the report said that stock "thus acquired" was treated as a contribution to capital, it was referring solely to cases involving "brother-sister corporations".

The administrative regulations carry forward these distinctions. Only the regulation section which sets forth rules for "Acquisition by related corporation (other than subsidiary)" contains any reference to treating the stock as a contribution to capital. Treas.Reg. § 1.304–2(a). There is no mention of such treatment of the stock in the parallel regulation pertaining to "Acquisition by a subsidiary". Treas.Reg. § 1.304–3(a).

The language and structure of section 304(a) reinforces this interpretation of the applicability of the fictional contribution to capital treatment. The parentheticals manifest an intent to distinguish between parent-subsidiary transactions and transactions involving other than subsidiaries. Similarly, if Congress had intended the rule enunciated in the concluding sentence of section 304(a)(1) to apply to paragraph (2) as well

as paragraph (1), it would have placed it after both paragraphs in such a way as to make its broader applicability clear.

We recognize that the Government's approach on this appeal to section 304, and particularly its reliance on 304(c), raises questions which cannot be answered solely by reference to the legislative history. It may be noted, however, that the rules contained in section 304(c) make all brother-sister corporations fit within the statutory definition of parent-subsidiary corporations as well, so that in effect all brother corporations can be deemed to be both a parent and a subsidiary of their sister corporations and vice versa.[20] This means that paragraphs (1) and (2) of 304(a) could both apply to many transactions involving two related corporations.[21] Thus there appears to be an intrinsic overlap in the statute which results in the potential imposition of conflicting rules for treating the stock acquisitions which fall within it and which blurs the otherwise clear distinctions between the statute's treatment of brother-sister and parent-subsidiary situations.

We do not believe that Congress intended to allow either the taxpayer or the Internal Revenue Service to choose which redemption and distribution rules should apply to a particular transaction.[22] Nor do we believe that Congress intended either paragraph to be superfluous. Yet, we have found nothing in the legislative history or subsequent administrative interpretations of this section which sheds any light upon this paradox.

**20.** Under the constructive ownership rules of 318(a)(3)(C), if a shareholder has controlling interest in brother-sister corporations, his controlling interest in the brother corporation is attributed to the sister and vice versa. Thus, both the brother and sister corporation would be deemed to have constructive controlling interest in the other so that each would be parent to the other.

**21.** In a case, such as the case at bar, where one party holds all, or substantially all, of the stock in a parent corporation which, in turn, holds all, or substantially all, the stock in a subsidiary, the parent's stock will be attributed, under section 318(a)(2)(C), to its controlling shareholder in proportion to that controlling shareholder's ownership of the parent and that controlling shareholder will be deemed to be in

control of the subsidiary as well. Thus, the two corporations will be constructively controlled by one party and they will fall into the terms of section 304(a)(1) as well as 304(a)(2).

**22.** In a given case involving two related corporations where the constructive ownership rules would make either Section 304(a)(1) or (a)(2) apply, if the corporation acquiring the stock has no earnings and profits from which to derive a taxable dividend, but the other corporation does, the Internal Revenue Service would no doubt want (a)(2), not (a)(1), to apply so that it would be the corporation with earnings and profits which was treated as redeeming the stock. See also 1 Mertens, Law of Federal Income Taxation § 9.106 at 371 (1974).

We do not need to concern ourselves, however, with all the ramifications of these potential overlaps in order to reach a decision here. Our concern is only whether the series of fictions created by section 304(a) to prevent circumvention of the rules set forth in sections 301 to 303 for taxation of corporate distributions should be extended beyond those sections to preclude application of section 1033 to Broadview's acquisition of Allen's stock. As with the constructive dividend issue, the Government is seeking to use these fictions to impose taxes upon Broadview beyond those expressly contemplated in the framework of sections 301 to 303. We do not believe that Congress in enacting sections 304(a) and 304(c) intended such far reaching consequences. If the distinctions between parent-subsidiary and brother-sister stock transactions are to be maintained, then the contribution to capital treatment of the acquired stock must apply only to corporations which are actually related as brother-sister, even though by resorting to the attribution of ownership rules one could convert what would otherwise be a parent-subsidiary relationship into a brother-sister relationship simply because one person or persons was also in control of the parent corporation.[23] Conversely, the redemption and distribution rules of section 304(a)(2) should only apply when the parent corporation had the necessary control of the subsidiary corporation without resort to constructively owned stock.[24]

In our opinion the district court properly concluded, both from the language of 304

and its legislative history, that "Congress elected to treat parent-subsidiary transactions differently from those in the related corporation context". We affirm the holding of the district court that Broadview is entitled to nonrecognition of its gain from the insurance proceeds. When a subsidiary corporation—which only can be categorized also as a sister corporation through the attribution rules of section 304(c)—acquires stock issued by its parent, the acquiring subsidiary's basis is its cost. Thus it is entitled to nonrecognition under section 1033 of any gain it might have realized because for the purposes of that section it is deemed to have "purchased" that stock.

### III. *Basis for Recording Assets Broadview Received from Allen*

■ The parties stipulated that Broadview properly recorded the assets received from Allen at a carry-over basis pursuant to section 334(b)(1).[25] The district court found, however, that "[i]n this agreement, both parties are mistaken". Following the holding of *Kimbell-Diamond Milling Co. v. Commissioner,* 14 T.C. 74 (1950), *aff'd per curiam,* 187 F.2d 718 (5 Cir. 1951), *cert. denied,* 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951), the court concluded that "the acquisition of the stock in Allen County was but a step in an overall transaction by which [Broadview] intended to acquire the assets of Allen County" and that "the assets acquired should have been recorded on plaintiff's books at a basis of $415,000, the cost of acquiring the stock from the John-

---

**23.** The regulations under section 304 indicate that the primary function of the capital contribution rule of subsection (a)(1) for brother-sister stock transactions is to provide a method for determining the basis of the stock received by the acquiring corporation and for adjusting the basis of the stock in the acquiring corporation still held by the transferor. Treas.Reg. § 1.304–2. Because in the usual case of a subsidiary acquiring the stock of its parent, the transferor would not be holding any stock of the acquiring corporation, there would be no need for a rule for adjusting the basis of such stock in the hands of the transferor.

**24.** See generally 1 Mertens, Law of Federal Income Taxation § 9.106 at 371–72 (1974).

**25.** Section 334(b)(1) reads:
(b) Liquidation of subsidiary.—
(1) In general.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b) ), then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor. If property is received by a corporation in a transfer to which section 332(c) applies, and if paragraph (2) of this subsection does not apply, then the basis of the property in the hands of the transferee shall be the same as it would be in the hands of the transferor.

son family members with adjustments made in that basis for any liabilities assumed".

Section 334(b)(1) provides that a corporation receiving assets in a section 332 liquidation ("complete liquidation of a subsidiary") takes them at the basis they had in the hands of the transferor, except when section 334(b)(2) [26] is applicable. Section 334(b)(2) provides that if its terms are met, then "the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made". In other words, section 334(b)(1) provides for a carry-over basis and section 334(b)(2) for a cost basis.

Broadview contends that the court erred in following *Kimbell-Diamond* and that section 334(b)(1) is applicable, rather than section 334(b)(2), to give the Allen assets a carry-over basis. The Government agrees that *Kimbell-Diamond* should not be followed. It contends on this appeal, however, (1) that if Broadview is held to have "purchased" stock under section 1033, it must also be held to have "purchased" the assets under section 334, with the resultant cost basis under 334(b)(2), and (2) that section 318(a) would not attribute the Allen stock owned by Johnsons to Broadview.

The district court rejected the Government's contention that Congress, in enacting section 334(b)(2), preempted the *Kimbell-Diamond* doctrine, and instead followed the holding of the Court of Claims in *American Potash & Chemical Corp. v. United States*, 399 F.2d 194, 185 Ct.Cl. 161 (1968),

that *Kimbell-Diamond* is viable despite section 334(b)(2). *Kimbell-Diamond* involved a factual situation similar to this case. The Kimbell-Diamond Milling Co., engaged primarily in the business of milling, processing, and selling grain products, received insurance proceeds following the destruction of its assets by fire. Seeking to avoid tax recognition of the gain it realized, Kimbell-Diamond acquired the stock of Whaley Mill & Elevator Company pursuant to a corporate resolution providing that upon acquisition of the stock, Whaley was to be liquidated by transferring all of its assets to Kimbell-Diamond. This was ultimately accomplished. The Tax Court, following the reasoning of *Commissioner of Internal Revenue v. Ashland Oil & Refining Co.*, 99 F.2d 588 (6 Cir. 1938), held that "the purchase of Whaley's stock and its subsequent liquidation must be considered as one transaction, namely, the purchase of Whaley's assets which was [Kimbell-Diamond's] sole intention", and that the basis of the assets was their cost. 14 T.C. at 80.

The Court of Claims in *American Potash* held that the *Kimbell-Diamond* "step-transaction" rule remained viable despite enactment of section 334(b)(2). In reviewing the legislative history of section 334(b)(2), the court noted the conspicuous absence of any statement of legislative intent to modify or abrogate *Kimbell-Diamond*. The court concluded that "[i]n the absence of some specific direction that *Kimbell-Diamond* is no longer viable, we find that it has not been preempted by section 334(b)(2)".

---

**26.** Section 334(b)(2) provides in pertinent part:

(2) Exception.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b) ), and if—

(A) the distribution is pursuant to a plan of liquidation adopted not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limit-

ed and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3) ) during a 12-month period beginning with the earlier of—

(i) the date of the first acquisition by purchase of such stock, or

(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made.

The Ninth Circuit reached a different result in two cases—*Boise Cascade Corp. v. United States*, 288 F.Supp. 770 (D.Idaho 1968) *aff'd per curiam*, 429 F.2d 426 (9 Cir. 1970), and *Pacific Transport Co. v. Commissioner of Internal Revenue*, 483 F.2d 209 (9 Cir. 1973), *vact'g* and *rem'g*, T.C. Memo 1970–41, *cert. denied*, 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974). In *Boise Cascade* the district court, whose opinion was adopted by the Ninth Circuit, held that section 334(b)(2) "was passed by Congress to eliminate a subjective intent test enunciated in *Kimbell-Diamond Milling Co. v. Commissioner* . . . ." 288 F.Supp. at 774. *Boise Cascade* was cited and followed in *Pacific Transport* for the proposition that the acquiring corporation's intent does not govern the basis for the assets of the liquidated corporation. 483 F.2d at 213–214.

The Fifth Circuit appears to follow the position taken by the Ninth Circuit, although in doing so it did not expressly decide that section 334(b)(2) had preempted the *Kimbell-Diamond* doctrine. In *Supreme Investment Corp. v. United States*, 468 F.2d 370, 377 (5 Cir. 1972) that circuit did make clear, however, that:

> In codifying the *Kimbell-Diamond* rule Congress made a major change: it substituted a series of objective tests in place of a determination of the taxpayer's subjective intent to obtain corporate assets.

We are persuaded that the Ninth and Fifth Circuits properly concluded that section 334(b)(2) was intended to substitute objective, definable standards for the subjective test of *Kimbell-Diamond*.[27]

The Court of Claims in *American Potash*[28] concluded that the Senate Report's statement that section 334(b)(2) "effectuates principles derived from *Kimbell-Diamond Milling Co.*,"[29] indicated that the principle of that section was only one aspect of the broader more general rule of *Kimbell-Diamond*. Section 334(b)(2) was merely "a precise, narrow and objective application of the broad doctrine". *Id.* at 208. The court was concerned that taxpayers would be able to choose between a cost and a carry-over basis if the statute were the only route for obtaining a cost basis. It found nothing in the history of the statute which indicated that the basis of assets acquired in these transactions was an elective matter.

We agree with the Court of Claims that section 334(b)(2) is not "elective", but we do not agree with its conclusion that the broader *Kimbell-Diamond* doctrine therefore still should apply to those cases where the standards of section 334(b)(2) have not been met. To so hold would render Congress' action meaningless. Under that rationale, a taxpayer could fall within the bounds of *Kimbell-Diamond* regardless of whether he had complied with section 334(b)(2), thereby making the precise qualifying standards of that section superfluous. Section 334(b)(2) is mandatory, not elective, in that intent no longer plays a role in determining which basis rule applies. If the terms of the statute are met, then a cost basis for the assets is mandatory; the taxpayer's intention or choice is immaterial. *Supreme Investment Corp. v. United States*, 468 F.2d 370, 377 (5 Cir. 1972). The statute is elective only in the sense that a taxpayer desiring to obtain a cost basis for the assets acquired may structure his transaction so that it meets the terms of section 334(b)(2).

---

**27.** The Tenth Circuit tacitly approved a similar holding by the Tax Court. *Kansas Sand & Concrete, Inc.*, 57 T.C. 522 (1971), *aff'd* 462 F.2d 805 (10 Cir. 1972).

**28.** Since neither party relies on *Kimbell-Diamond* or *American Potash*, it is unnecessary to discuss these cases in detail. It may be noted, however, that the *Kimbell-Diamond* doctrine is a two-edged blade which can cut both for and against the taxpayer. In the *Kimbell-Diamond* case itself it cut against the taxpayer because the cost of the stock of the liquidated corporation was less than the carry-over basis of the assets which were distributed in liquidation. Nonetheless, in many cases, the application of the *Kimbell-Diamond* doctrine will benefit the taxpayer by giving him a stepped-up, cost basis for the previously depreciated assets of the liquidated corporation, instead of the lower carry-over basis it would otherwise obtain.

**29.** S.Rep.No.1622, 83d Cong., 2d Sess. (1954), [1954] U.S.Code Cong. & Admin.News 4621, 4894.

We believe that this election is consistent with the intent of Congress in enacting section 334(b)(2). Throughout the legislative reports accompanying the 1954 Internal Revenue Code, the language used to describe the function of section 334(b)(2) is that it *permits* the taxpayer to *retain* as his basis for the distributed assets his cost of acquiring the liquidated corporation's stock. *E. g.*, H.R.Rep.No.1337, 83d Cong., 2d Sess. (1954), [1954] U.S.Code & Admin.News 4017, 4063, 4247. That choice of language indicates that Congress viewed Kimbell-Diamond as providing taxpayers with a valuable exception to the general rule that the basis of assets acquired by shareholders in liquidation would be carried over from the liquidated corporation. Section 334(b)(2) was enacted to clarify when that exception would apply. Congress apparently recognized that the two-edged blade of *Kimbell-Diamond* would lead to litigation because taxpayers receiving assets upon liquidation would try to obtain the benefit of a stepped-up basis by arguing that their original intention in buying the stock of the liquidated corporation was to acquire that corporation's assets. Yet, because Congress still felt that taxpayers in certain specific instances should be *permitted* to obtain these benefits of a stepped-up basis, it set forth objective standards necessary to qualify for that exception.

The House version of this section would have permitted cost basis treatment for all shareholders receiving assets on a liquidation distribution which met the standards. The Senate version which was adopted, however, limited cost basis treatment to liquidations by a parent corporation. The Senate report evidences the practical reasons for these limits and reinforces our interpretation of the legislative intent behind the statute: "Since the application of the rule of [*Kimbell-Diamond*] is primarily in the area of liquidations by a parent corpora-

tion of its subsidiary, the rule has been limited by your committee to liquidations of this type". S.Rep.No.1622, 83d Cong., 2d Sess. (1954), [1954] U.S.Code Cong. & Admin.News 4621, 4679.

As the Tax Court has recognized, Congress has established few guidelines for analysis of integrated or step-up transactions. It has generally avoided strict rules due to the practical difficulties of trying to provide for all possible forms of corporate transactions. Courts have been left to fashion rules responsive to these varied transactions. In contrast, by enacting section 334(b)(2) "Congress marked out at least one area where the integration of steps must be made by reference to certain objective definitional, chronological, and transactional criteria". *Kansas Sand & Concrete, Inc.*, 56 T.C. 522, 528 (1971), *aff'd* 462 F.2d 805 (10 Cir. 1972). The mechanical rules of section 334(b)(2) provide a clear method for determining what basis will apply to assets received in liquidation in the most frequently recurring fact situation, liquidation of a subsidiary by a parent. It is a solution to a common tax planning problem, to lessen the uncertainty surrounding prior law. *Kansas Sand & Concrete, Inc.*, 56 T.C. at 528.

We hold that the subjective tests of *Kimbell-Diamond* are not applicable to the facts here. In so holding we are, therefore, in agreement with the position taken by the Government throughout this case.[30] We disagree, however, with the Government's contention that section 334(b)(2)'s objective tests have been met, which would require that Broadview's basis for the assets acquired in liquidation of Allen be equivalent to the cost of the Allen stock.

In addition to containing precise standards which must be satisfied to qualify for cost treatment, section 334(b)(2) requires that the stock of the subsequently liquidat-

---

**30.** The Government has consistently taken the position that the subjective intent tests of *Kimbell-Diamond* are precluded in cases falling within the ambit of section 334(b)(2). See, *e. g., Pacific Transport Co. v. Commissioner*, 483 F.2d 209 (9 Cir. 1973), *cert. denied* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974);

*Boise Cascade Corp. v. United States*, 288 F.Supp. 770 (D.Idaho 1968), *aff'd per curiam*, 429 F.2d 426 (9 Cir. 1970); *American Potash & Chemical Corp. v. United States*, 399 F.2d 194, 185 Ct.Cl. 161 (1968). See also Rev.Rul. 60–262, 1960–2 C.B. 114, 115.

ed corporation be acquired by "purchase". Section 334(b)(3) [31] defines "purchase" for the purposes of (b)(2). If any of the descriptions contained in subparagraphs (A), (B), or (C) do not apply to the transaction, then no "purchase" occurs when the stock is acquired and the basis of the assets obtained in liquidation is carried over instead of stepped-up.

The Senate Report expressly declared that in general it intended "to limit the definition of the term 'purchase' to cases where the acquisition of the stock was made in a taxable transaction". S.Rep.No.1622, 83d Cong., 2d Sess. (1954), [1954] U.S.Code Cong. & Admin.News 4621, 4895. Keeping in mind our view that section 334(b)(2) was intended to *permit* taxpayers to obtain an exception to the general rule of 334(b)(1), we take that to mean that Congress did not want taxpayers who had acquired assets through stock transactions which avoided taxation to be able to take advantage of a stepped-up basis as well. [32]

The parties agree that only subparagraph (C) of section 334(b)(3) is at issue here. Subparagraph (C) incorporates by reference the constructive ownership rules of section 318(a). If under section 318(a)'s rules the stock is deemed to be acquired "from a person the ownership of whose stock would . . . be attributed to the person acquiring such stock", then no "purchase" has occurred, and the taxpayer is not entitled to a stepped-up basis in the assets received in liquidation. See, *e. g., Bijou Park Properties, Inc.*, 47 T.C. 207, 218 (1966). The district court found that the constructive ownership rules of section 318(a) meant that the Johnsons' ownership of the Allen stock would be attributed to Broadview, so

Broadview could not have purchased that stock under the terms of sections 334(b)(2) and (b)(3).

The Government first argues that if Broadview "purchased" the Allen stock for purposes of nonrecognition under section 1033, it also "purchased" the stock for purposes of section 334(b)(2). Section 334(b)(3) makes clear, however, that the "purchase" definition contained there has a limited function, "[f]or the purposes of paragraph (2)(B)". If the standards of sections 334(b)(2) and (b)(3) are met, then a corporation is deemed to have purchased the stock and must use the cost basis required. We do not believe that for other purposes provisions or definitions contained in other sections of the Internal Revenue Code could not also apply to the given transaction, even though the words used may appear to conflict with the words used here. Cf. *Eastern Color Printing Co.*, 63 T.C. 27, 35 (1974).

The Government also contends that section 318(a) does not apply to attribute the Johnson family's ownership of the Allen stock to Broadview. Although the route is circuitous, we find that section 318(a)'s various provisions do have the effect of making Broadview constructive owner of the Allen stock held by the Johnsons. First, because all of the outstanding stock in Allen was owned by members of the Johnson family, each member of the family, under section 318(a)(1), is considered to own all of the stock owned by the other members of the family. Thus, each member of the family is deemed to be 100 percent owner of the Allen stock. Then as 100 percent owners of Allen, the Johnsons, under section

---

**31.** The Section 334(b)(3) provides in pertinent part:

Purchase defined.—For purposes of paragraph (2)(B), the term "purchase" means any acquisition of stock, but only if—

(A) the basis of the stock in the hands of the distributee is not determined (i) in whole or in part by reference to the adjusted basis of such stock in the hands of the person from whom acquired, or (ii) under section 1014(a) (relating to property acquired from a decedent),

(B) the stock is not acquired in an exchange to which section 351 applies, and

(C) the stock is not acquired from a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock.

**32.** Mertens, Law of Federal Income Taxation, Code Commentary, § 334(b)(2):2 states that "the general purpose of these provisions is to insulate Kimbell-Diamond benefits where a tax-free acquisition occurs. . . . "

714

318(a)(2)(C)[33] are considered to be owners of all stock owned by Allen. Because Allen owned 63.4 percent of Broadview's stock, the Johnsons were constructive owners of 63.4 percent of Broadview.

Under section 318(a)(5)(A),[34] all stock constructively owned is considered as actually owned. The Johnsons were then, in effect, controlling owners of both Allen and Broadview because they owned 50 percent or more in value of the stock in both corporations. As such, under section 318(a)(3)(C),[35] the stock owned by the Johnsons is considered to be owned by the corporations which they control. Broadview thereby would be deemed to constructively own the Allen stock owned by the Johnsons, and by acquiring the Allen stock from the Johnsons it would be acquiring stock "from a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock".[36] By falling within the terms of section 334(b)(3)(C) the transaction would not qualify, for the purposes of section 334(b)(2), as a "purchase", and the general rule of section 334(b)(1) would apply instead.[37]

Finding that the subjective intent tests of *Kimbell-Diamond* have been replaced in certain instances by the objective standards of section 334(b)(2) and finding that section 334(b)(2) does not apply because the stock was not purchased as that term is defined for that section, we conclude that Broadview's basis for the assets it received in liquidation of Allen is carried over from the basis of those assets in Allen's hands.

### Conclusion

We conclude that (1) the district court erred in holding that Allen received a constructive dividend upon Broadview's purchase of its outstanding stock; (2) the court correctly held that under section 1033 Broadview is entitled to nonrecognition of its gain from the fire insurance proceeds; but (3) Broadview properly recorded the assets received from Allen at a carry-over basis pursuant to section 334(b)(1).

The judgment of the district court is reversed in Cause No. 73 F 105; and the judgment in Cause No. 73 F 104 is affirmed, as modified herein.

**33.** Section 318(a)(2)(C) states:

(C) From corporations.—If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such person shall be considered as owning the stock owned, directly or indirectly, by or for such corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation.

**34.** Section 318(a)(5)(A) reads:

(A) In general.—Except as provided in subparagraphs (B) and (C), stock constructively owned by a person by reason of the application of paragraph (1), (2), (3), or (4), shall, for purposes of applying paragraphs (1), (2), (3), and (4), be considered as actually owned by such person.

**35.** Section 318(a)(3)(C) reads:

(C) To corporations.—If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such corporation shall be considered as owning the stock owned, directly or indirectly, by or for such person.

**36.** The Government has argued that the language in Treas.Reg. § 1.318–1(b)(1) which states that: "A corporation shall not be considered to own its own stock by reason of section 318(a)(3)(C);" precludes attribution of the Johnsons' ownership of Allen to Broadview. That language does not apply here because Broadview is not considered to own its own stock; it is considered to own Allen stock.

**37.** Our finding that the close corporate relationships involved here would preclude section 334(b)(2) treatment of cost as basis is consistent with our interpretation of the nature of that section. Because the section will often convey a substantial benefit upon the taxpayer by giving him a stepped-up basis, Congress imposed the attribution rules of section 318(a) to insure that those benefits are not obtained by artificial transactions between closely related parties or economic interests. Cf. Mertens, Law of Federal Income Taxation, Code Commentary, § 318:1.